**REYNOLDS et al. v. McMAN OIL & GAS CO. et al. (No. 887—4592.)**

Commission of Appeals of Texas, Section B. Dec. 12, 1928.

Wm. J. Berne, of Fort Worth, and Kinder & Russell and Meade F. Griffin, all of Plainview, for plaintiffs in error.

H. P. Brelsford and Funderburk & Richardson, all of Eastland, Thompson & Barwise, of Fort Worth, and John Rogers, of Tulsa, Okl., and Ellis Douthit, of Abilene, for defendants in error.

SPEER, J. This case presents the question whether or not a lessor under the mineral lease in common use in this state may recover from the lessee for gasoline manufactured from casing-head gas under the stipulation for the usual royalty on oil produced and saved.

The suit was instituted by plaintiffs in error, the lessors, against the defendants in error, as assignees of the original lessee, and upon the conclusion of the evidence the trial court instructed a verdict against the plaintiffs, and that judgment was affirmed by the Court of Civil Appeals. 279 S. W. 939.

Originally, the plaintiffs' pleadings were very voluminous, and presented several counts seeking a recovery upon different theories, but, as finally resolved, the contention of plaintiffs in error relies upon the right to recover one-eighth of the gasoline produced by defendant in error McMan Oil & Gas Company as for oil produced and saved under the terms of the lease; while the defendants in error contend that, under the terms of the lease, such recovery should be denied. At the threshold of the consideration, we are therefore required to examine and construe the contract. Much has been said in the submission of the case, and will need to be said in our disposition of it, as to whether or not gasoline is oil within the meaning of the contract. But this is only of secondary importance, and may or may not become material, depending upon the construction to be given to the lease. It was suggested by counsel for defendants in error upon the presentation that the liberty and sanctity of contract is of vastly more importance than all the oil in Texas; and this is obviously true. Since both parties rely upon the terms of the contract, a critical examination of the same becomes necessary.

The ordinary oil and gas lease in common use in this state, such as the one in controversy here, has been frequently before the Supreme Court for consideration, and has been construed to be a grant of the minerals (oil and gas) in place. Stephens County v. Mid-Kansas, etc., Co., 113 Tex. 160, 254 S. W. 290, 29 A. L. R. 566; Texas Co. v. Davis, 113 Tex. 321, 254 S. W. 304, 255 S. W. 601; Robinson v. Jacobs, 113 Tex. 231, 254 S. W. 309; Munsey v. Marnet Oil & Gas Co., 113 Tex. 212, 254 S. W. 311; Thomason v. Ham, 113 Tex. 239, 254 S. W. 316. Such being the holding with us, the decisions of those states which treat the lease as a mere option or privilege are of little value upon the questions involved here. These cases above referred to did not specifically decide (for it was unnecessary) the extent of the estate granted in such minerals, but the later cases of Waggoner v. Wichita County, 273 U. S. 113, 47 S. Ct. 271, 71 L. Ed. 566, and Hager v. Stakes, 116 Tex. 453, 294 S. W. 835, do affirmatively decide that the extent of the estate granted in such instruments is the oil and gas, less the exception contained in the royalty clause, which exception is real estate and remains the property of the lessor.

The construction of the particular lease being thus imperative, that instrument is here set out, in so far as necessary, as follows:

### "Oil and Gas Lease.

"Agreement made and entered into on this the 2nd day of December, 1918, by and between S. E. Reynolds, surviving wife of J. W. Reynolds, deceased (and other parties), parties of the first part, hereinafter called lessors, and W. T. Garrett, party of the second part, hereinafter called lessee:

"Witnesseth: That the said lessors, for and in consideration of the sum of $29,544.00 cash in hand paid, the receipt of which is hereby acknowledged, and of the covenants and agreements hereinafter contained on the part of the lessee, to be paid, kept and performed, have granted, conveyed, demised, leased and let, and by these presents do grant, convey, demise, lease and let unto the said lessee for the sole and only purpose of mining and operating for oil and gas and laying pipe lines and of building tanks, powers, stations and structures thereon to produce, save and take care of said product, all that certain interest in and to three certain tracts of land and which adjoin each other and situated partly in Eastland and Erath Counties, States of Texas, and described as follows, to-wit: (Here follows description of land in controversy, amounting to 246.2 acres.)

"The interest of the lessors above named granted by this lease being an undivided interest of approximately four-fifths in and to said three tracts of land hereinabove described.

"It is agreed that this lease shall remain in force for a term of five years from this date and as long thereafter as oil or gas or either of them is produced from said land by the lessee.

"In consideration of the premises, lessee covenants and agrees:

"1st. To deliver to the credit of the lessors, free of cost in the tanks or pipe lines to which he may connect his well, the equal one-eighth part of all oil produced and saved from the leased premises.

"2nd. To pay to the lessor $100.00 each year in advance for the gas from each well where gas only is found, while the same is being used off the premises, and lessor to have gas free of cost from any such well for all stoves and all inside lights in the principal dwelling house on said land during the same time, by making his own connection with the well at his own risk and expense.

"3rd. To pay the lessor for gas produced from any oil well and used off the premises at the rate of $100.00 per year for the time during which such gas shall be used, said payment to be made each three months in advance. * * *

"Lessee shall have the right to use free of cost gas, oil, and water produced on said land for its operations thereon except water from wells of lessor. * * * "

The lease contained the usual stipulations for annual rentals in the event of failure to drill within the time stipulated therein and other stipulations not important in our consideration.

Another lease identical in form was executed by the guardian of the minors owning the remainder of the fee to the tracts involved.

■■ First, of course, in construing a deed, like any other contract, the intention of the parties is of primary and controlling importance. Where the contract is unambiguous, this intention must be determined from the instrument itself, considering all its parts in their proper bearing. If the terms of the instrument give it a definite legal effect, the inquiry is concluded, and no intention, however discovered, can contradict or destroy the legal effect of the terms used. If the instrument as written does not really represent the contract as made, there may be a right in equity to relief by way of cancellation or reformation, but this does not pertain to construction, and the principle has no place in the present inquiry, for all parties are standing on the contract as written.

■ In determining the legal effect of a deed, whether as to grant, exception, reservation, consideration, or other feature, the inquiry is not to be determined alone from a single word, clause, or part but from every word, clause, and part that is pertinent. The relative positions of the different parts of the instrument are not necessarily controlling; the modern and sounder reason being to ignore the technical distinctions between the various parts of the deed, and to seek the grantor's intention from them all without undue preference to any, for the plain intention of the grantor as disclosed by the deed as a whole controls the construction. These rules are elementary.

■■ The inquiry in the present case calls for a consideration of the rules of construction with reference to exceptions and reservations. The extent, and possibly nature, of an estate granted may be dependent upon an exception or reservation in the deed, and the construction and operation of both the grant and the exception or reservation must be determined from the entire instrument, taking into consideration the object and purposes of the instrument. The office of an exception is to take something out of the thing granted that would otherwise pass, and the exception, as an estate, is of a kind with that granted; whereas a reservation carves out of the grant a new thing or estate, and it therein differs from an exception which is ever a part of the thing granted and of a thing in esse at the time. 18 C. J. p. 337, § 337; Id. p. 340, § 339. Simply illustrated, a grant of block 5 except lot 1 is an exception; whereas a grant of block 5 with a life estate to the grantor is a reservation. For the purpose of determining the extent of the grant, however, the distinction between exceptions and reservations is of no practical importance, since whether the one or the other *the property excepted or the estate reserved is never included in the grant.*

Bearing in mind these general rules of construction, we will analyze the instrument lying at the foundation of plaintiffs' case and likewise defendants' defense.

■ 1. The "lease," when construed as a whole, is undoubtedly a grant of a determinable fee to oil and gas in place on the land described.

■ While the letter of the instrument is to grant the described *"tracts of land,"* nevertheless the instrument as a whole, considering the purposes for which the same was executed, shows the grant to be of oil and gas situated in place on the land. And, it may be observed, this grant covers every mineral that has been discovered on the land. It necessarily includes all gas whether from an oil well or not, and whether such gas contains oil or not.

■■ 2. The effect of the first paragraph, providing for a consideration commonly called the royalty, is to limit the grant to the extent of a one-eighth part of all oil produced and saved from the leased premises. This clause as to oil granted is technically an ex-

ception, for it pertains to property of a kind as, and part of, the estate granted and existing at the time. *The one-eighth part of all oil thus excepted from the grant does not constitute any part of the grant.* A part excepted is not granted. A part or estate not granted necessarily remains with the grantor. Associated Oil Co. v. Hart (Tex. Com. App.) 277 S. W. 1043.

3. The third clause of the so-called royalty provision stipulates for the lessee to pay to the lessor "for gas produced from any oil well and used off the premises at the rate of $100.00 per year for the time during which such gas shall be used, said payment to be made each three months in advance." This does not purport to be, nor is it within itself, a grant, an exception, or a reservation. It is not a grant, for it is an obligation of the lessee. It is not an exception, for it is not an estate of a kind with the grant, and it is not a reservation, for it is not an estate or fee of any kind in real property. *It is a personal obligation* imposed upon the lessee by way of consideration, to be sure, but no more than the ordinary promise of rentals. It is the agreed compensation for a thing—gas—already granted.

We have said that the stipulation with respect to gas produced from an oil well does not evidence a grant of such gas. This does not imply there was no such grant, for clearly there was. But the grant arises from the granting clause proper, precisely in the same manner and to the same extent that the oil was granted; the grant being for the "sole and only purpose of mining and operating for oil and gas." It is this clause of the instrument upon which defendants in error base their contention that the contract of the parties speaks specifically with reference to gas produced from an oil well (from which the gasoline in controversy was manufactured), and therefore that it is controlling in the determination of the case. This contention is thus stated by Judge Powell in his memorandum of dissent from the recommendation made by this section of the commission on a former hearing of the case:

"The contract as I view it is perfectly clear. As so construed it is not necessary to here determine whether or not casing-head gas in the absence of definite contract provisions is gas or oil. The parties had in mind that there is dry gas and wet gas. The former comes from wells where gas only is found. The latter comes from oil wells. These lessees agreed to pay a definite royalty for each or either kind of gas which they desired to use off the premises. The lessees took this wet or casing-head gas from oil wells and used it off the premises by converting it into gasoline and then selling it. It was wet gas produced and taken from oil wells just as the contract provided. It was just as definitely provided for as if it had been called casing-head gas. The latter gas is gas from a well which also produces oil. Since the parties contracted as they did, they must be so bound. Since the lessees paid the royalty called for in the contract, they were entitled to the judgment rendered for them in the District Court."

The principle that specific language of an instrument will control general terms is well known, and is at the very foundation of the rule allowing exceptions and reservations. The section being considered is not controlling, for the very reason that it is not definite and specific, as against the oil royalty clause excepting one-eighth of the oil. Literally, it applies only to "gas produced from any oil well and used off the premises." The gas in this instance was not used off the premises. Besides, such gas including the gasoline (oil) sued for herein, the clause itself is more general than the reservation.

Now, if gas, whether dry or wet, as those terms are commonly used, be not granted in the general clause as heretofore shown, they are not granted at all. This clause providing for rentals for gas produced from an oil well is undoubtedly a valid and meaningful agreement, notwithstanding the grant of oil and gas, and notwithstanding the exception of one-eighth the oil produced and saved. It was well known at the time of making the contract, and clearly contemplated by the language touching that subject, that natural gas may be profitably used as fuel in the development of an oil lease, and likewise that gas from an oil well may be similarly used. The words "used off the premises" in covenants 2 and 3 are very significant. They indicate an acquaintance with the custom of using gas for developing such leases, and indicate that this was the extent of the right (or perhaps the probable desire) of the lessees to use gas from the lease. "Used" in this connection is not necessarily synonymous with "disposed of" or "sold." Rather, it is synonymous with "employed" or "consumed." Meaning must be given to the word according to the nature of the thing to be used and according to the subject-matter of the agreement for use. The fair meaning of the third clause of the royalty covenant in the light of the other parts of the instrument simply is that, in the event the lessee uses gas produced from an oil well off the premises, he shall pay to lessor the rate of $100 per year for the time it is so used. This is not inconsistent with the grant or the exception already noticed. This interpretation is justified, if it is not compelled, by the perfectly obvious fact that, at the time the lease was made, under the conditions as they then existed, gas, whether dry or wet, was considered practically as waste—of little value, except for the purpose of fuel in developing the lease and a possible use for sale for similar purposes off the lease, in which

latter event it was agreed that a definite compensation should be paid to the lessor, in addition to the general consideration. To give the clause the effect contended for by defendants in error—that is, to treat it as a specific stipulation fixing the title to gas from an oil well in defendants in error—would be giving to the language employed in the section a forced meaning, and making the rental clause perform an unusual function, a grant, and would be an altogether useless thing, for we have shown the grant in the first place included gas as well as oil.

But, conceding that the third clause of the royalty covenant, in connection with the other relevant parts of the instrument, does constitute a grant of the specific thing—gas produced from an oil well—as contended for by defendants in error, the final rights of the parties are not changed one whit. The case for defendants in error, under such interpretation, would certainly be no stronger than if the direct grant had expressly mentioned casing-head gas. If such had been the grant, or if such is the grant, on the whole instrument—that is oil, gas and casing-head gas—still there is the more specific exception of one-eighth of all oil produced and saved from the premises, and, the exception being no part of the grant, the thing excepted remains the property of the lessor. Moreover, the exception saving to the lessor one-eighth of the oil produced and saved from the premises is effective against the clause being considered in any possible event. In the strongest possible way let it be assumed that the lessor granted expressly to the lessee gas produced from any and all oil wells, yet the provision for the delivery to lessor of one-eighth the oil produced and saved from the premises would be effective as a reservation, and would defeat the claim of title by defendants in error to all of the casing-head gas. The grant in such a case would be general of casing-head gas or gas produced from an oil well, and the reservation, being special—that is, oil produced and saved —would be specific, and an estate created out of the grant. We have said the grant of wet gas would be general and the reservation special upon the assumption that casing-head gas, wet gas, or gas from an oil well, includes oil, which will be considered hereafter. If gas from an oil well or casing-head gas does include or contain oil, then a grant of such gas with a reservation of oil is not repugnant, but is perfectly consistent and valid. See Associated Oil Co. v. Hart, supra.

So that, when the lease in controversy is analyzed and properly construed, it has the effect to grant an estate in the nature of a determinable fee in the oil and gas underlying the land in controversy with a valid exception and reservation of a one-eighth part of all oil produced and saved from the leased premises, and it remains only to be determined whether or not gasoline manufactured from casing-head gas is oil within the meaning of that exception.

In 1 Thornton Law, Oil and Gas (4th Ed.) § 137b, it is said:

"Casinghead gas is a component part of oil. It is not made from dry gas, nor a product of it; but it is a product of wet gas, and wet gas exists only with oil. Gasoline can be manufactured from it. Turning to the scientific side of this discussion we find this in an accepted authority: 'The pentanes, hexanes, and heptanes are the only constituents of crude oil that at earth temperatures have vapor pressures of such magnitude that are distilled in quantity from the crude oil; hence they are the chief liquid constituents of natural gasoline.'"

In Gilbreath v. States Oil Corp. (C. C. A.) 4 F.(2d) 233 (writ refused by Supreme Court 268 U. S. 705, 45 S. Ct. 639, 69 L. Ed. 1167), the question arose upon the trial court's sustaining the defendants' motions dismissed for want of a cause of action. The Circuit Court of Appeals, reversing that court, said:

"Our conclusion is that the casing-head gas or gasoline must be considered as part of the oil since it partakes of the nature of that substance rather than what is ordinarily known as natural gas. It makes no difference that it is brought up in the form of vapor, or is extracted by artificial means. It forms the most important element of petroleum oil, and, as such, the lessee should be required to pay therefor; otherwise, he would be receiving a very valuable product without giving anything in return therefor. On this basis, plaintiff, we think, should receive a one-eighth royalty. Wemple v. Producers' Oil Co., 145 La. 1031, 83 So. 232; Locke et al. v. Russell et al., 75 W. Va. 602, 84 S. E. 948."

Our Supreme Court has never discussed this question, but in Livingston Oil Corp. v Waggoner (Tex. Civ. App.) 273 S. W. 903, the Court of Civil Appeals for the Seventh District, through Justice Randolph, held that the evidence in that case warranted a finding that casing-head gas was a constituent part of the oil, and that the lessee producing same by vacuum process must account to the lessor for one-eighth thereof under the terms of the lease as for royalty on oil. After quoting the testimony, the court said:

"From this statement of the witness' testimony, it will be observed that casing-head gas is a constituent element of oil; that, in place, it is realty, not personal property. * * * It is conclusively shown by the testimony of appellant's own witness that casing-head gas is in liquid form in the earth, that it is a constituent of oil, and in order to remove it from the earth it must be vaporized and then carried to the surface, where it is again condensed in liquid form."

The court cites for its conclusion Twin Hills Gasoline Co. v. Bradford Oil Co. (D. C.)

264 F. 440; Wemple v. Producers' Oil. Co., 145 La. 1031, 83 So. 232; Thornton, Law of Oil and Gas (4th Ed.) § 137d; Locke v. Russell, 75 W. Va. 602, 84 S. E. 948; Hammett Oil Co. v. Gypsy Oil Co., 95 Okl. 235, 218 P. 506, 34 A. L. R. 275. The Supreme Court refused a writ of error to this decision.

The method of producing gasoline from casing-head gas is of comparatively recent use. The source and nature of such gas, however, appear to be very generally understood and quite fully agreed to by those familiar with such matters. All of the cases deciding the question and all of the experts writing upon the subject are in substantial accord, and indicate the undisputed fact to be that casing-head gas, as distinguished from natural gas, sometimes called dry gas, contains the lighter constituent elements of petroleum oil, and is very valuable. Indeed, such gas is ofttimes the most valuable product of an oil field. It is the principal agent, or at least a very substantial one, for recovering petroleum. Through its buoyancy upon being released from the earth pressure, it becomes a carrier of oil, whether in a gusher or in a well stimulated by artificial means as the use of a vacuum. In the light of improved methods of mining, it has been demonstrated that the productivity of an oil field is very materially increased through the distillation of the oil beneath the surface, bringing it out in the form of casing-head gas, to be again reduced to its liquid form as gasoline. Indeed, the agreed facts in this case give emphasis to the·results possible by the use of such methods. The lessees brought in some twelve or thirteen oil wells on the lands in controversy. For approximately ten months next following they operated the wells solely for oil, and took no casing-head gas therefrom. At the end of that time, they erected on the premises a plant for advancing casing-head gas to commercial gasoline, and about that time put vacuums on the wells. From the casing-head gas thereafter taken, the lessees obtained to the time of the trial gasoline valued at $770,000, during which time no crude oil was produced, but the residue gas was sold at $200 per month.

In making decision, the courts will take judicial notice of all matters of science or common knowledge without the necessity of proof. The matter as to which such notice is taken is nevertheless one of fact. Whether a material fact is known to the court as matter of law or made known through the agency of testimony is of no importance. Of course, this judicial notice implies the absolute truth of the fact known, and, such fact being undisputed, its effect becomes matter of law. Now, every court must be held to know as matter of law that gas from an oil well, called casing-head gas because delivered at the casing head of an oil well, also sometimes called wet gas, contains component parts of the petroleum oil, is both oil and gas; that liberating the pressure of the earth upon the gas which exists in the oil in liquid form under the earth permits the escape of the gas by reason of its buoyancy, and that in its escape it carries with it the lighter more volatile.parts of the petroleum in such quantities that it is easily recoverable in the form of gasoline—which contains the most valuable elements of the crude oil. The courts judicially know these facts (though the judicial memory with respect thereto is greatly refreshed from examining the authorities) as well as they know that the most familiar liquid in the world, water, is composed of two constituent gas elements, to wit, hydrogen and oxygen in the proportion by weight of 11.186 and 88.814 per cent., respectively, and that such combination may be broken up as by heat generating steam, or by exposure to the air, through evaporation, and caused to assume a gaseous form, and that such new forms of steam and moist air may again be converted into the original form of water. Just as the disturbing element of heat or absorption by air impairs even to depletion a quantity of water, so the process of distilling through the vacuum process the oil underneath the earth into casing-head gas impairs perceptibly, if not to depletion, the body of oil affected. We have seen no authority, either judicial or scientific, that does not recognize as a fact that gasoline produced from an oil well does contain the lighter and most valuable component parts of crude petroleum. We have appended to this opinion a number of excerpts from scientific sources which make plain the source and nature of gasoline and the manner of producing casing-head gas from which it is obtained.

The question of whether or not a lessor may compel a lessee to install the necessary equipment and bear the necessary expense to recover gasoline from the casing-head gas on the lease is not a matter of concern in the present case. Such a question when it arises may be solvable upon the principles herein discussed, but that question is not involved in this case. The all-important clause reserving to the lessor one-eighth of all oil produced and saved from wells on the premises makes no limitations or distinctions whatever as to the method of production or saving. Whether the oil be produced by natural expulsion through a gusher or the same be pumped by machinery can make no difference. Whether the saving be in the form it emerges from the earth or after a separating as from water by skimming, or by distilling through a vacuum and reduction by a process, or by any other means whatsoever, under the very terms of the lease, the oil having been produced and saved from the wells on the lease, the lessor has title to, and is entitled to receive, a one-eighth part thereof.

This reservation is the very heart of the lease; it is truly an essential, if not the essential, purpose of the contract.

The question of cost of recovering the gasoline from the casing-head gas does not affect the right of lessor to the one-eighth of the oil produced and saved from the premises which is expressly stipulated to be "free of cost in the tanks," etc. The lessee has determined the question of whether or not he will recover the gasoline, and, having "saved" it, under the very terms of the lease, one-eighth of the recovery belongs to lessor "free of cost." Where such question is not voluntarily resolved by the lessee, doubtless it would be solved upon the principles of reasonable diligence in discharging the implied duty of conservation of the oil.

The line of decisions cited by plaintiffs in error to the effect that a willful trespasser guilty of conversion of another's property will not be allowed the value of improvements or betterments placed thereon has no application to the questions here presented.

Again, the principle or rule of construction that a contract will be construed in the light of conditions and circumstances existing at the time of its execution has no application, because such artificial aid to intention (and the rule is that and nothing more) can only be invoked where the language of the contract is ambiguous, and there is therefore need of such aid to construction. But never will such consideration be allowed to contradict the legal effect of the unambiguous terms of the instrument. See Kahn v. Kahn, 94 Tex. 114, 58 S. W. 825; 8 R. C. L. p. 1035, § 91, note 2. Such surrounding circumstances do have their bearing and are entitled to consideration, where the instrument is ambiguous, to aid the court in construing the language of the instrument and ascertaining the parties' intention therefrom, but will not be permitted to produce a construction inconsistent with the words used so as to add to or detract from the instrument. Where the language of the instrument is plain, certain, and unambiguous, the surrounding facts and circumstances will not be considered. 18 C. J. p. 260, § 217.

This rule forbidding extrinsic inquiry applies to judicial knowledge as well as testimony admitted at the trial. A fact, condition, or circumstance, whether judicially known, or judicially ascertained, is not judicially cognizable, when the same is not pertinent or material to the issue, as where it will contradict or vary the legal effect of an unambiguous contract.

In the present case the surrounding circumstances at the time of the execution of the lease explain and make evident the mutual understanding of both parties that gas in any form was practically a waste product, and its only real value lay in its use as fuel on or off the premises. They never for once contemplated that it was perhaps the chief value of the minerals they were dealing with. But what of this? The indisputable fact remains that the contract as a whole, in plain, certain, and unambiguous terms, excepted and reserved to the lessor in any and all events one-eighth of all oil produced and saved from the premises, free of cost, and that large quantities of gas containing oil have been produced and saved from the premises. So the conclusion is inescapable that plaintiffs in error are entitled to recover.

It remains to be seen whether or not counsel for plaintiffs in error have, by their conduct of the case, waived the right to complain of the court's error in giving a summary instruction against them. Of course, if the matter has not been waived, the cause should be reversed for the giving of the summary instruction against plaintiffs' right to recover under the oil royalty covenant. The Court of Civil Appeals thus states its reasons for holding a waiver:

"The bill of exceptions, to the court's action in excluding the parol testimony offered by plaintiffs as shown above, contains the following:

" 'After argument in which the plaintiffs admitted that it would be necessary for them to show that defendants had notice of the terms of the contract and representations that plaintiffs claimed to have been made, and if plaintiff failed to show notice to defendants of the terms of said complete contract and representations, it would be the duty of the court to instruct a verdict for defendants.'

"In plaintiffs' brief is found the following observation:

" 'There are but two questions in this court, namely: (1) Are Garrett's declarations provable, despite the parol evidence rule? If not, the case ends there.'

"Upon oral submission, the attention of plaintiffs' counsel was directed to the case of Livingston v. Waggoner, supra, and counsel then disclaimed any reliance upon it and declared that such a doctrine had no application to the case presented by plaintiffs in error."

It will thus be seen clearly the statements of counsel for plaintiffs consisted of their opinion of the law applicable to the case. There is no question of a waiver involving a matter of fact, nor yet is it a case of misleading the court by a request for issues or instructions. Orderly procedure would not permit counsel to lead the court into an error and then to complain of the court's doing precisely what he was asked to do. The expressions of opinions as to the law of the case by counsel are not binding either upon his client or the court. In 2 R. C. L. p. 989, it is said:

"Generally speaking, an attorney of record may enter into stipulations and agreements in all matters of procedure during the prog-

ress of the trial, and stipulations thus made, so far as they are simply necessary or incidental to the management of the suit, and which affect only the procedure or remedy as distinguished from this cause of action itself, and the essential rights of the client are binding on him, though the court has power, without doubt, in case of fraud or mistake to relieve a party from the effects of such agreement."

And on the next page it is further said:

"Admissions of fact made by an attorney in the progress of a trial are usually held to be binding on his client, provided such admissions are distinct and formal and made for the express purpose of dispensing of formal proof of such facts at the trial; * * * A stipulation or admission of counsel as to a matter of law has, however, been held to have been of no effect."

In 25 R. C. L., at page 1098, it is said:

"The implied authority of an attorney to make stipulations is ordinarily limited to matters of procedure in the management or prosecution of the action and in the absence of special authority, any stipulation which operates as a surrender of the substantial rights of the client will not be upheld by the courts."

These text statements appear to be amply supported by the authorities, and certainly are in keeping with sound legal principles.

The case of Swift & Co. v. Hocking Valley Ry. Co., 243 U. S. 281, 37 S. Ct. 287, 61 L. Ed. 722, is much in point. There the parties stipulated as to certain facts which were not, as a matter of truth, in keeping with the undisputed facts disclosed in the record. The Supreme Court, denying the binding effect of such stipulation, said:

"If the stipulation is to be treated as an agreement concerning the legal effect of admitted facts, it is obviously inoperative; since the court cannot be controlled by agreement of counsel on a subsidiary question of law. * * * If the stipulation is to be treated as an attempt to agree 'for the purpose only of reviewing the judgment' below, that what are the facts shall be assumed not to be facts, a moot or fictitious case is presented. 'The duty of this court, as of every judicial tribunal, is limited to determining rights of persons or of property, which are actually controverted in the particular case before it. * * * No stipulation of parties or counsel, whether in the case before the court or in any other case, can enlarge the power, or affect the duty, of the court in this regard.' * * * We treat the stipulation, therefore, as a nullity."

So here the plaintiffs in error's rights are fixed by the terms of the lease itself, which is before the court. And, if the stipulation were as to facts alone, being directly contradictory of the lease as we have interpreted it, the same would be a nullity. But the stipulation is not of that dignity. It is no more than the expression of an opinion of the law applicable to the undisputed facts. Counsel, in his zeal to maintain his theory that oral evidence should be heard as to the intention of the parties, has declared that, in the absence of such evidence followed by notice to his opponents, the court should give a summary instruction against his clients. And, further, he has declared that the matter of proving the lessee's declarations at the time of taking the lease was material, and finally that his case is not controlled by Livingston Oil Corp. v. Waggoner. Even though wrong in all these contentions, counsel has done nothing to estop his client by waiver or otherwise. His expressions are but the usual —or perhaps unusual—earnest protests of a zealous advocate. It was insisted upon the oral arguments that counsel's conduct amounted to an election of remedies in the trial court, and that, upon the principle of election, plaintiffs in error are bound, but this further contention is answered in the fact that there was no choice of remedies, since the supposed remedy which counsel for plaintiffs is alleged to have elected is admittedly no remedy at all. The doctrine of election of remedies has no place in the consideration.

It will be borne in mind that we are not considering a case where the contract of lease specifically deals with casing-head gas or gasoline manufactured therefrom. Where the contract is thus specific, the courts will respect the agreement of the parties, and there is no room for implications or construction. The distinction is clearly made in the case of Magnolia, etc., Co. v. Connellee (Tex. Com. App.) 11 S.W.(2d) 158, this day reported by us to the Supreme Court.

The trial court having given a summary instruction against the plaintiffs, the judgments of both courts must be reversed. The measure of damage, however, will not be a one-eighth of the gasoline manufactured by defendants in error from the casing-head gas, but rather it will be one-eighth part of the value of the casing-head gas as it was produced and saved from the wells; that is, the plaintiffs in error should not be allowed to recover the value of such portion of the casing-head gas plus the cost of manufacturing the same into gasoline. As already observed, there is nothing alleged or proved in the case that would make the defendants in error liable to this extent as for a willful conversion of plaintiffs in error's property. It is only where the conversion is willful that the wrongdoer is liable for the value of the property in its changed condition effected by his labor or expenditure.

We recommend that the judgments of the Court of Civil Appeals and of the trial court be reversed, and that the cause be remanded to the trial court for another trial in a manner not inconsistent with this opinion.

GREENWOOD and PIERSON, JJ. Judgments of the district court and Court of Civil

Appeals reversed, and cause remanded to the district court.

We approve the holding of the Commission of Appeals on the questions discussed in its opinion.

Appendix to Opinion.

EXHIBIT A

HOLE FOR SUCKER ROD
STUFFING BOX.
OIL OUTLET
2" TUBING
CASING HEAD
GAS OUTLET
GAS OUTLET
DERRICK FLOOR
GAS
OIL
GAS
CASING
WHERE CASING HEAD GAS ENTERS CASING
2" TUBING
WORKING BARREL
OIL & GAS SAND
PERFORATED PIPE

The above print will be helpful to understand the discussion of the method of producing casinghead gas. The Bulletins and Technical Papers quoted from, are prepared and published by the Bureau of Mines, Department of the Interior, Washington, D. C.

The following excerpts are from experts and technical writers cited by counsel for plaintiffs in error, and are appended as an aid to understanding the source and nature of casing-head gas and the production of gasoline therefrom:

"A casinghead is the cast iron fitting that screws on the top of the casing of an oil well, through which the casing-head gas flows.

"There are various sizes and designs of casingheads. Their size varies according to the casing, generally from 2¾ in. up to 10 in., and the opening in the top from one to four inches. The side openings vary from one to three inches, two inch being the most commonly used. The top is generally placed on top of a gasket and held in place by set screws through the casinghead. In the early days when the gas was not needed for local heating or flambeau torches, the side openings were left open and the casinghead gas flowed into the atmosphere." Westcott, Handbook of Casinghead Gas (3d Ed.) pp. 6 to 8.

A paper by Mr. L. L. Brundred, read before the Petroleum Division of the Amer. Institute of Min. and Metall. Engineers at Tulsa, Okl., in October, 1926, published in Pet. Dev. & Tech. 1926, at p. 40 et seq. contains an account of the effect of a differential in the pressure in an oil sand caused by drilling a well into the sand. The writer shows that, as the pressure is reduced at any given point in the sand, a minute bubble of gas, surrounded by a film of oil, is given off by the oil. This bubble starts to travel towards the point of least resistance, the well. As it travels, the bubble encounters the sieve-like action of the sand, which breaks it up into numerous other bubbles each surrounded by its film of oil, and he says:

"These films of oil being under the same pressure as the bubbles themselves are subject to vaporization and as the bubbles travel along towards points n, o, p, vaporization of a part of the film takes place, thus forming new bubbles, each always surrounded by its own film of oil. Again the sieve-like action of the sand tends further to break each bubble, forming many new ones, until we finally have thousands of little bubbles rushing into the well. In the case of a new well they lighten the weight of the column of fluid and actually furnish the energy to make it flow. As time goes on, the number of bubbles decreases, for the supply is limited, and soon there are not enough to furnish this energy. The well then becomes a pumper, these bubbles bursting and rising to the surface as casing-head gas. Later, as the supply of easily vaporized hydrocarbons is depleted, we find our differentials in pressure so equally balanced by the sand resistance as to permit only the most meager travel of oil into the hole. The general result of this condition is abandonment of the well."

"When a well is drilled through the impervious strata capping an oil sand the pressure is released at that point and an avenue of escape for the oil and gas is afforded. The gas absorbed in the oil immediately expands and flows toward the hole, moving oil with it. As there is less frictional resistance to the movement of the gas it moves much faster than the oil, and consequently the gas is exhausted first. While the pressure is high only the dry gases absorbed in the oil are liberated, but as the pressure is reduced

by the escape of gas, the wet gases liquefied and dissolved in the oil, are released and supply energy. The composition of the gas changes as the pressure is reduced, the proportion of ethane and other higher hydrocarbon gases and vapors increasing so that the gas begins to get 'wet' and becomes valuable for the extraction of gasoline by compression. There comes a time in the life of the well, provided it is not prematurely cut off, when practically all of the force of the compressed gas absorbed in the oil has been expended and gravitation is the principal remaining force. The movement of the oil then becomes so slow that it does not flow into the well rapidly enough to make a profitable production, and the well is abandoned, although only a minor part of the oil may have been removed from the sand. The well is said to be exhausted, yet in reality it is not the oil, but the expulsive forces which have been exhausted." Bulletin 148, p. 20.

"New oil fields often reach the zenith of their production soon after their discovery and then decline rapidly. This happens because the so-called 'flush' production of a field is made during the time that the oil in the ground contains a maximum of dissolved gas which aids its movement to the wells." Technical Paper 209, p. 7.

"When wells flow openly into the air or into a sump, a serious loss of oil results. The loss is from two causes: (1) The sudden release of pressure, which allows the gas to escape and carry with it quantities of oil held in suspension, and (2) the evaporation caused by the spray of oil. If a water spray is an efficient evaporative device, the evaporation loss from the spray from a flowing well caused by the release of a pressure of 500 pounds or more per square inch must be tremendous. The oil saved from a well flowing unrestrained into the air is, therefore, heavier than the oil produced by the same well under control. The loss from evaporation alone in a wildly flowing well producing oil of Cushing grade will probably exceed 25 per cent. during the time of expulsion; when a well flows into an open sump the loss will probably exceed 10 per cent. This does not cover losses in handling and storage. The gas, of course, is wasted. Not only do the so-called 'dry' gases escape, but during their rapid exit from solution in the oil they carry away much of the lighter fractions as vapor. Hence the escaping gas is often highly saturated and its gasoline content entails a heavy loss." Technical Paper 209, p. 8.

Bulletin 95, p. 137, and Morrison, Oil and Gas, p. 960, thus define casing-head gas:

"Natural gas rich in oil vapors. So named as it is usually collected, or separated from the oil, at the casinghead. Frequently called combination gas or wet gas."

"The gas is essentially a mixture of natural gas and the vapors of the lighter components of petroleum. The proportion of vapor has been obviously increased by the loss of methane from the natural storage reservoir in the earth. When the well is worked for petroleum, the coincident reduction of pressure on the petroleum permits the release of dissolved natural gas and vapors of petroleum in the form of the gaseous substance known as casinghead gas." Westcott, p. 10.

"When the well is worked for petroleum, the coincident reduction of pressure on the petroleum permits the release of dissolved natural gas and vapors of petroleum in the form of the gaseous substance known as casinghead gas." Id. p. 11.

"When dry natural gas is passed over or through oil carrying gasoline, the latter will slowly vaporize or change into a gas when under the right temperature and pressure conditions until the gas becomes saturated with gasoline vapors. The lighter gasoline vapors would vaporize first.

"This process is commonly spoken of as 'the natural gas picking up the gasoline.'" Id. p. 12.

"Casinghead gas is the name given to the gas which flows from oil wells, and, as a rule, comes from the same 'sand' or formation, as the oil, and should not be confused with dry or natural gas which comes from a sand other than the oil sand and is usually under high pressure. Its name is derived from the fact that it is taken from the well through the casinghead. It consists of a mixture of the lighter members of the methane series, namely, methane, ethane, propane, butane, pentane, etc., but heavier hydrocarbons than predominate in natural gas." Id. p. 35.

"Casinghead gas represents gas that occurs in contact with oil and hence has an excellent chance to mingle with and carry out of the well some of the lighter vapors—the gasoline of the oil. Furthermore such natural gas is usually under low pressure. In fact, many oil wells are operated under a vacuum, so that most of the gas has been removed in the past and that being withdrawn consists largely of gasoline vapors. The greater the content of gasoline in the oil and the greater the partial vacuum applied to the well the more gasoline vapor, other things being equal, will be withdrawn from the well." Bulletin 120, p. 16.

"When the pressures are not too high, considerable quantities of vapors from the lighter constituents of the oil are carried by the gases, just as water vapor is carried in the atmosphere. The carrying power of all gases is the same, provided no chemical reactions take place, and air can carry just as much gasoline vapor as can natural gas." Bulletin 148, p. 12.

"The air in passing through the oil sand picks up and carries with it some of the lighter constituents of the oil, that is—gasoline." Bulletin 120, p. 59.

"A promising field for the absorption proc-

ess lies in the treatment of gas from oil wells producing from a sand into which air has been forced under pressure to increase the oil production. This gas, as it flows from the wells, can be treated by the absorption process and the gasoline it contains extracted." Bulletin 120, p. 66.

"The physical effects of air and natural gas in the sand are much the same. More of the natural gas will go into solution under the same conditions, but whether this fact would prove of importance in practical operations is not known. Apparently the air has not affected the oil unfavorably; and, so far as the writer knows, there would be little choice between air and natural gas from this cause. Theoretically air or any other gas would carry just as much gasoline vapor as natural gas, and where it is hoped to recharge dry natural gas by passing it through the oil sand probably no better effects will be gained than with air." Bulletin 148, p. 60.

"The pentanes, hexanes, and heptanes are the only constituents of crude oil that, at earth temperatures, have vapor pressures of such magnitude that they are distilled in quantity from the crude oil; hence, they are the chief liquid constituents of natural-gas gasoline." Bulletin 88, p. 95.

"Pentane, hexane, and heptane are liquids and are the chief constituents of ordinary refinery gasoline." Bulletin 88, p. 26.

"The gasoline carried in natural gas and precipitated at different points in the treatment consists mostly of pentane and hexane, the fifth and sixth members of the paraffin series, smaller proportions of heptane, the seventh member, and decreasing percentages, if any, of propane and butane, the third and fourth fractions." Bulletin 151, p. 104.

"Pentane and hexane are liquids at ordinary temperatures, and are those vapors carried by the gases that constitute most of the gasoline extracted from natural gas." Bulletin 120, p. 15.

"Most of the gasoline that is obtained by the absorption method comes from pentane and hexane." Bulletin 120, p. 9.

"Pentane, hexane, heptane, octane, nonane. are the liquid members of the paraffin series of hydrocarbons which mainly concern the natural-gas gasoline industry. They are the important ones and are, with butane, the main constituents which make up the gasoline extracted from natural gas." Burrell, p. 73.

"The paraffin hydrocarbons that principally concern the gasoline producer are methane, ethane, propane, and the butanes, pentanes, hexanes and heptanes. The first four are gases at ordinary temperatures, the last three liquids. The gases, i. e., methane, ethane, propane and butane, after contact with the oil in the earth bring with them the vapors of the liquid hydrocarbons, i. e., pentane, hexane and heptane. The vapors are carried along with the permanent gases in the same manner that water vapor exists with air. After treatment in the gasoline plant, where the capacity of the gases to carry the vapors is much lessened, the vapors are deposited." Bulletin 88, p. 94.

"The extraction of gasoline from natural gas is a physical process." Burrell, p. 73.

"The compression process is a physical process." Bulletin 88, pp. 48, 96.

"The absorption process is a physical phenomenon." Natural Gasoline, p. 124.

"Natural gas is essentially a mixture of gases in which the paraffin series of hydrocarbons predominate, with much smaller proportions of carbon dioxide and nitrogen." Bulletin, p. 15.

"In the gasoline industry natural gas is popularly classified in two great divisions—'wet' gas and 'dry' gas. Gas not intimately associated with oil is known as 'dry' gas; that in the same stratum with oil and in intimate contact with it is the so-called 'wet' gas, from which gasoline is condensed. As the result of many analyses, the Bureau of Mines finds that natural gas is a mixture in which the hydrocarbons of the paraffin series predominate and that small proportions of nitrogen, carbon dioxide, and water vapor are present." Bulletin 88, p. 20.

"Crude oils or petroleums are mixtures of bituminous hydrocarbons, some of which are solids, some are liquids, and some are gases, the solids and gases being soluble in the liquids. A crude oil may consist of these various hydrocarbons in almost any proportions, its physical properties varying accordingly. * * *

"The gas held in solution by the oil is an especially important factor in the recovery of oil from the formations in which it is found.

"Under the same conditions of temperature and pressure a particular oil will absorb a fixed proportion of a particular gas, but this proportion or co-efficient of absorption, as it is called, varies with each oil and each gas. The gas is held absorbed in the oil in the same way that soda water is charged with carbon dioxide. * * * Enormous quantities of gas are held in solution under the high initial pressure found in some oil wells. Some of the constituent gases are condensed at these high pressures just as in a compressor plant, and as long as high enough pressure is maintained exist as liquids dissolved in the gas. Under such conditions the gas is not absorbed as a gas but as one liquid dissolved in another. * * * Other gases (methane, ethane and propane) are never liquefied at the pressures and temperatures in oil sands penetrated by wells, but are always found as gases dissolved or absorbed in the oil. They constitute the so-called dry gases." Bulletin 148, p. 11.

"As the pressure is reduced in a producing oil sand the absorbed gases are released from solution and the liquefied gases expand and

become true gases while quantities of gasoline vapor are carried in the gases. At every reduction of pressure there is a corresponding liberation of gas and an increase in the quantity of gasoline vapors, so that the gas becomes richer and richer as the pressure is reduced, and is more desirable for the making of gasoline. In the expansion of the gases, as the pressure is reduced, an enormous amount of energy is released which is the principal force in driving the oil from the sand into the wells." Bulletin 148, p. 13.

"The gas absorbed in the sand immediately expands and flows toward the hole, removing oil with it. As there is less frictional resistance to the movement of the gas it moves much faster than the oil, and consequently the gas is exhausted first. While the pressure is high only the dry gases absorbed in the oil are liberated, but as the pressure is reduced by the escape of gas, the wet gases, liquefied and dissolved in the oil, are released and supply energy." Bulletin 148, p. 20.

"The principal function of the gas pump, as has been shown, is to permit more gas to expand from solution in an oil sand where the pressure has been reduced almost to atmospheric." Bulletin 148, p. 67.

"The amount of any gas held in solution in a liquid is dependent upon pressure and temperature. * * * Thus with increasing pressures proportionately larger quantities will be held in solution. Obviously, then, when an oil field is under 1,000 pound rock pressure, much larger volumes of natural gas are held in solution than when the rock pressure has declined, for example, to 100 pounds. During the period of this declining pressure, gas comes out of solution and carries the oil to the points of low pressure—that is, the wells." Reports of Investigations, Department of Commerce, Bureau of Mines, Serial No. 2732, p. 3.

"Generally the compressed gas in the oil sand is the principal force in expelling the oil from the reservoir rock. The recovery of the oil therefore largely depends on the amount and the pressure of the gas associated with the oil. Under the preceding discussion of saturation, it is stated that in the writers' opinions most of the gas intimately associated with the oil is absorbed in the oil. * * *

"The reasons for the larger wells and greater recoveries at the deeper horizons are evident when the fact is borne in mind that the gas pressures are generally proportionate to the depth of the sands.

"The amount of oil recovered is influenced as much by the rock pressure and the amount of gas absorbed in the oil as by almost any other factor." Bulletin 194, p. 15.

"When a field is new the gas pressure is high and much dissolved gas is produced with the oil. This volatilizes upon coming in contact with the air, carrying with it some of the lighter fractions of the oil. This loss can be largely eliminated by the use of gas traps that separate oil and gas and save a valuable portion of crude oil which might otherwise be lost by evaporation. * * * The gas from such traps or separators usually has high gasoline content and should be treated before being used. If the gas pressure is low oil can be run into a gas trap upon which a vacuum is maintained. In addition to removing the gas the vacuum decreases the pressure on the oil, thus causing some of the lighter and more volatile fractions, which would otherwise be lost by evaporation in the flow tank, to be given off." Bulletin 232, p. 123.

"Petroleum in the so-called paraffin-oil fuels consists of hydrocarbons of the paraffin series, which range from the heaviest oil to the lightest gas. The gaseous constituents of petroleum exist in what may be likened to solution, much like the gas of soda water, and as such expand and escape when the pressure is relieved by a well." Bulletin 88, p. 8.

"New oil fields often reach the zenith of their production soon after their discovery and then decline rapidly. This happens because the so-called 'flush' production of a field is made during the time that the oil in the ground contains a maximum of dissolved gas which aids its movement to the wells. During this period the production of gas reaches its maximum and the quality of the oil is at its best." Technical Paper 209, p. 7.

"When the first wells are drilled in a new field, much permanent gas is generally found with the oil, sometimes having such a pressure that it forces out the liquid, causing the well to flow intermittently or even steadily. Oil produced under such conditions evaporates very rapidly during the first day or two that it is stored, because it contains much dissolved gas. This gas volatilizes quickly on exposure to the air and naturally carries with it some of the lighter gasoline fractions.

"As a field grows older, the gas pressure decreases until the oil has to be pumped. As the oil then has much less permanent gas in solution it evaporates more slowly." Bulletin 200, p. 8.