**SOUTHLAND ROYALTY COMPANY et al., Appellants,**

v.

**PAN AMERICAN PETROLEUM CORPORATION et al., Appellees.**

No. 5501.

Court of Civil Appeals of Texas.

El Paso.

Jan. 31, 1962.

Rehearing Denied Feb. 21, 1962.

Jackson, Walker, Winstead, Cantwell & Miller, Kilgore & Kilgore, Charles B. Wallace, Dallas, Stubbeman, McRae, Sealy & Laughlin, Jack Vickrey, Midland, for appellants.

Turner, Rodgers, Winn, Scurlock & Terry, Dallas, Richard C. Milstead, Kermit, J. K. Smith, Fort Worth, L. A. Thompson, Tulsa, Okl., for appellees.

Archie E. Groff, Houston, for North Central Oil Corp.

LANGDON, Chief Justice.

This is an appeal from a summary judgment out of the District Court of Winkler County, which decreed that appellants (plaintiffs below) "take nothing" in a suit brought by appellants for the recovery of gas royalties allegedly due them under the terms of an oil and gas lease on lands in Winkler County. Declaratory judgment relief was also granted to appellees upon a cross-action.

Appellants (Southland Royalty Company, Avoca Corporation and Socony Mobil Oil Company, Inc.) had each filed separate suits in the district court against appellees (Pan American Petroleum Corporation and Westbrook-Thompson Holding Corporation). The three petitions were substantially the same. The suits were consolidated, and a single petition was filed by all three appellants in the consolidated cause. Thereafter, appellants joined in a motion for summary judgment, incorporating therein the pleadings, exhibits and admissions on file. Appellees filed an answer and a cross-action, and also a motion for summary judgment in which they likewise incorporated the pleadings, admissions and a large number of affidavits and exhibits in support thereof.

After hearing and argument on the motions for summary judgment, the trial court sustained the motion of appellees, denied the motion of appellants, and decreed that appellants take nothing. Upon appellees' cross-action, the court further decreed (1), that the cloud be removed from appellees' leasehold title, cast thereon by the filing of this suit; and (2), that the oil and gas lease, *by its own terms*, provided separately for the royalties to be paid for each of the separate substances which the parties thereto contemplated might be discovered and produced thereunder, including:

"To pay to the lessor One Hundred Dollars, each year in advance for the gas from each well where gas only is found, while the same is being used off the premises."

From such judgment this appeal has been duly perfected.

The lease involved in this controversy is on a printed form in which the blanks have been filled in with a typewriter and certain interlineations made in long-hand on the printed portions thereof. It is dated March 27, 1925, covers 10,240 acres of land in Winkler County, and was executed April 1, 1925 by T. G. Hendrick and wife, Ida Hendrick, lessors, to J. W. Grant, lessee (appellees' predecessor in title). Appellees are the present owners of the lease in so far as it covers three quarter-sections of land (480 acres) of the 10,240 acres included therein, and appellants are the owners of varying mineral interests in the lands covered by the lease, including the 480 acres of land with which we are here concerned.

Under the terms of the lease, T. G. Hendrick and wife, Ida Hendrick, granted and leased the premises to appellees' predecessor in title "for the sole and only purpose of mining and operating for oil and gas *potash or other minerals*". Among other provisions, the lease contract specified, "It is agreed that this lease shall remain in force for a term of 20 years from this date, and as long thereafter as oil or gas, *potash or other minerals* or either of them is produced from said land by the lessee." A nominal consideration was recited and, in addition thereto, three covenants were specified as follows:

"In consideration of the premises the said lessee covenants and agrees:

"1st. To deliver to the credit of lessor, free of cost, in the pipe line to which they may connect thei— wells, the equal one-eighth part of all oil produced and saved from the leased premises. *and ⅛ of the net proceeds of potash and other minerals at the mine.*

"2nd. To pay the lessor One Hundred Dollars, each year in advance for the gas from each well where gas only is found, while the same is being used off the premises, and lessor to have gas free of cost from any such well for all stoves and all inside lights in the principal dwelling house on said land during the time by making their own connections with the well at their own risk and expense.

"3rd. To pay lesssor for gas produced from any oil well and used off

the premises at the rate of Fifty and No/100 Dollars per year, for the time during which such gas shall be used, said payments to be made each three months in advance." (Emphasis ours.)

We have italicized all hand-written interlineations in the printed portions of the lease from which we have quoted above.

The principal question presented by this appeal is whether the words, "and ⅛ of the net proceeds of potash and other minerals at the mine", added in long-hand to the first royalty paragraph of the lease, entitles appellants to receive from appellees, their alleged proportionate part of ⅛ of the proceeds realized from the sale of gas and distillate produced by appellees from three deep wells on the 480 acres of land involved here.

Appellants have predicated their appeal upon four points. Points One and Two are based upon the contentions that the amounts received by appellees from the sale of gas from the three deep wells are proceeds of minerals within the meaning of the first royalty provision of the oil and gas lease, on which appellants are entitled to be paid their part of the ⅛ royalty; and that such gas was *sold* and was therefore not "being used off the premises" within the meaning of the second royalty paragraph of the lease.

In support of their contentions, appellants rely heavily upon the case of Reynolds v. McMan Oil & Gas Co., 11 S.W.2d 778, decided by the Commission of Appeals in 1928, in which it was said:

"* * * The words 'used off the premises' in covenants 2 and 3 are very significant. They indicate an acquaintance with the custom of using gas for developing such leases, and indicate that this was the extent of the right (or perhaps the probable desire) of the lessees to use gas from the lease. 'Used' in this connection is not necessarily synonymous with 'dis-posed of' or 'sold.' Rather, it is synonymous with 'employed' or 'consumed.' Meaning must be given to the word according to the nature of the thing to be used and according to the subject-matter of the agreement for use. The fair meaning of the third clause of the royalty covenant in the light of the other parts of the instrument simply is that, in the event the lessee uses gas produced from an oil well off the premises, he shall pay to lessor the rate of $100 per year for the time it is so used."

The royalty covenants in the oil and gas lease construed in the Reynolds case are very similar to those contained in the lease now before us.

In December of 1928, three cases involving substantially the same questions of law were decided by Section B of the Commission of Appeals. These cases were Reynolds v. McMan Oil & Gas Co. (supra); Magnolia Petroleum Co. v. Akin, 11 S.W.2d 1113; and Magnolia Petroleum Co. v. Connellee, 11 S.W.2d 158. In each of these cases the lessor, or mineral owner, sought to recover from the oil and gas lessee, under the stipulation for the ⅛ royalty *on oil* produced and saved, a like royalty on gasoline manufactured from gas produced from oil wells (casinghead gas). Lessor was allowed recovery of an oil royalty on gasoline manufactured from casinghead gas in the Reynolds case, but the lessors in both the Connellee and the Akin cases were denied any such recovery. The Reynolds and Akin cases were handed down December 12, 1928 and, although the Connellee case appears to have been handed down on December 5, 1928, the opinion in the Akin case states: "The instrument of lease involved in this case is identical with that this day construed by us in Magnolia Petroleum Co. v. Earn T. Connellee, [Tex. Com.App.,] 11 S.W.2d 158, and the decision of that case controls the disposition of this one."

The only real distinction between the three cases is that second and third royalty provisions contained in the Connellee and Akin leases employed the words, "sold or used off the premises", while in the same numbered royalty paragraphs of the Reynolds lease, the word "sold" was omitted, and only the words "used off the premises" were employed.

Since the decisions in the Reynolds, Akin and Connellee cases, the Supreme Court has had the opportunity to express itself on at least two different occasions with respect to the meaning of the term "used off the premises." In the case of Humble Oil & Refining Co. v. Poe, 29 S.W.2d 1019, decided by the Commission of Appeals in 1930, the court was confronted with a royalty clause almost identical to the second royalty clause of the Hendrick lease. In the Poe case the lease provided:

"* * * lessee agrees to pay the lessor at the rate of $250 each year, payable quarterly in advance, for the gas from each well where gas only is found, *while the same is being used off the premises.*" (Emphasis ours.)

In the Poe case, while there was no evidence as to what disposition was being made of the gas, and particularly whether such gas was being "sold", or otherwise disposed of at a profit, the court laid the question at rest in the following unequivocal language:

"Plaintiff in error acquired the right to use the gas produced from a gas well it might drill on the premises covered by the lease by the payment of the agreed rental of $250 per annum. *Having bought and paid for such gas it owned the same, including all of its constituent elements,* and therefore had the lawful right to make such use of it as it might deem proper." (Emphasis ours.)

The court, in the Poe case, refused to make the distinction between the words "sold" and "used" that was made by the court in the Reynolds case; but, on the contrary, cited and followed the Connellee decision.

In 1932 the same point was again before the courts of this state. In the case of Lone Star Gas Co. v. Harris, 45 S.W.2d 664 (writ refused), the Eastland Court of Civil Appeals had before it an oil and gas lease in which the second and third royalty clauses are identical to those contained in the Hendrick lease involved in this case. The court repudiated the holding in the Reynolds case; followed the Connellee, Akin and Poe cases (all involving oil and gas leases), and also cited and followed Lone Star Gas Co. v. Stine, 41 S.W.2d 48, decided by the Commission of Appeals in 1931. The Stine case involved a deed and an operating agreement under which title to the natural gas was actually conveyed to the grantee therein. In passing on the question of title to the gas, the Eastland court made the observation that the deeds and operating agreement in the Stine case did not more certainly convey to the lessee the gas produced from gas wells than the lease contract, and then proceeded to hold as follows:

"In the Stine Case the gas company had the right to 'drill for and develop gas and take the same free from any charge or royalty,' having paid a large consideration for 'natural gas' developed under the contract, *while in the instant case the lessee acquired the right to all gas from each well where gas only is found by paying $300 each year for the same."* (Emphasis ours.)

The Hendrick lease involved here contains the same words of grant as the lease involved in Lone Star Gas v. Harris, supra. The products or substances which the parties contemplated might be found on the leased premises were separately identified and conveyed in the granting clause. Again, in the royalty provisions of the lease, each substance was separately

treated and a separate royalty provided for each such substance. The Hendrick lease conveyed the "oil and gas, potash or other minerals", and provided for a definite and specific royalty on each, as follows:

(a) On oil "free of cost, in the pipe line to which they may connect their wells, the equal one-eighth part";

(b) and "⅛ of the net proceeds of potash and other minerals at the mine";

(c) "One Hundred Dollars each year in advance for the gas from each well where gas only is found";

(d) "For gas produced from any oil well" "Fifty and No/100 Dollars per year".

At the time of the execution of the oil and gas lease in question, the terms "oil", "gas" and "potash" were familiar words in common usage, particularly in the area of the location of the lands that were the subject of this contract. It is in the record (and undisputed) that potash was discovered relatively near the lands involved in this case, in 1925, the same year in which the lease contract was executed. The north line of Winkler County forms a common boundary line with the State of New Mexico at its southeast corner, and there was a potash mine near Carlsbad, New Mexico, near to the Winkler County line. The method of mining potash in this mine is similar to the methods used in mining coal, in that they use the room and pillar method.

■ Under these circumstances, the terms used in the lease having acquired a definite, fixed and popular meaning, and not being otherwise defined—then, in the absence of fraud, accident or mistake, it will be conclusively presumed that the parties to the contract were familiar with and understood the subject matter about which they undertook to contract, and that the terms used by them in the contract were intended to be given their ordinary and popular meaning. Magnolia Petroleum Co. v. Connellee, Tex.Com.App., 11 S.W.2d 158; Heinatz v. Allen, 147 Tex. 512, 217 S.W.2d 994.

■ The parties to this lease stipulated a specific royalty on all oil produced from *wells*; a specific royalty was stipulated for the gas produced from any *oil well*, and another and separate royalty was specified for the gas produced from *wells where gas only is found*. The term "at the mine", used in connection with the royalty fixed upon "potash and other minerals", as that term is employed in the instant lease contract, clearly separates and distinguished the substances (oil and gas) which the parties contemplated would be produced from *wells,* and the substances (potash and other minerals) which the parties contemplated would be produced from a *mine.*

■ Further, we believe the rule of ejusdem generis has application here, so as to preclude a court from construing the term, "potash and other minerals", as that term is used in the instant lease in context with other terms employed there, to include gas, a substance completely different from a species of minerals such as potash. Gladys City Oil, Gas & Mfg. Co. v. Right of Way Oil Co., Tex.Civ.App., 137 S.W. 171; Right of Way Oil Co. v. Gladys City Oil, Gas & Mfg. Co., 106 Tex. 94, 157 S.W. 737.

■ We construe the lease in this case to vest a determinable fee title in the lessee to the gas estate in the land involved here, subject to the lessees' obligation (when such gas is used off the premises) to pay $100 per year, in advance, for the gas from each well where gas only is found; $50.00 per year, quarterly in advance, for gas produced from any oil well; and the obligation to permit the lessor to have gas free of cost, from wells producing gas only, for all stoves and inside light in the principal dwelling house on said land.

Appellants have made no contention that they are entitled to receive a royalty on casinghead gas (gas produced from oil wells), which appellees admit they have produced and sold from the leased premises. Their pleadings and allegations are confined to the gas from three deep wells (wells from which gas only is produced). It is contended by appellants, and admitted by appellees, that $929,938.55 has been realized from the sale of the gross proceeds of the natural gas from these three deep wells, as of September 30, 1959.

Assuming that we are correct in holding as we do, that the title to the natural gas passed to the lessees, it remained the property of the lessees, whether on or off the lease, until the lessees in some manner divested themselves of the title, by sale or otherwise, or until the gas itself ceased to exist by virtue of being consumed in some useful manner, or escaped, or was simply wasted by flaring. We believe the term "used off the premises", when that term is not expressly restricted in clear language to some particular use or uses, is broad enough to include, and does include, any use or disposition that the owner of such gas might wish to make of it, including the right of sale.

In a case decided in 1924 by the Supreme Court of Oklahoma, an oil and gas lease, which we believe to be identical with the printed provisions of the Hendrick lease, was construed. (Mussellem v. Magnolia Petroleum Co., 107 Okl. 183, 231 P. 526). In that case, the meaning of the words "used off the premises" was in dispute. The court there held that the lessee (Magnolia Petroleum Company) was vested with the title to the gas, and made this interpretation of what is meant by "off the premises", as well as "on the premises":

"The words 'on' and 'off' are correlatives, and to determine what the latter means, might be best reached by a proper conception of what the word 'on' as used in the lease, conveyed. It had no other meaning than used in connection with the development of the premises. The words 'off the premises' had no other meaning to the parties, than if the gas was appropriated to a purpose foreign to utilization for the benefit of development of the property itself. In other words, it did not have particular reference to place where used, but the purpose and objects of its use, to-wit, one foreign to the development of the premises in question."

From what we have said, it follows that we believe that appellants' Points One and Two should be overruled.

Appellants' third point is based on the contention that the royalty provisions of the Hendrick lease are plain and certain, without conflict or ambiguity, and parol evidence of an allegedly inconsistent course of dealing was not admissible or entitled to consideration to create an ambiguity or to explain or construe the lease, and that the trial court erroneously granted appellees' motion for summary judgment.

In passing upon appellants' first two points, we concluded that the trial court did not err in holding that the oil and gas lease, *by its own terms,* provided separately for the royalties to be paid for each of the separate substances which the parties thereto contemplated might be discovered and produced thereunder. We also held that the title to the natural gas in controversy passed to the lessee under the terms of the lease, subject to the payment of the $100 per year royalty specified under express provisions of the second royalty paragraph; and, finally, we held that the term "used off the premises" imposed no restriction upon appellees, as the owners of such gas, from using or disposing of the gas in any manner they might wish, including its sale.

We believe the parties to this instrument have clearly revealed their purposes and intent by the language actually used; however, if it be conceded that the

oil and gas lease is ambiguous as to whether it was intended to include an additional ⅛ royalty on natural gas by the addition of the words, "and ⅛ of the net proceeds of potash and other minerals at the mine", the most cogent evidence that the trial court did, in fact, correctly interpret the oil and gas lease is the practical construction placed upon the lease by the parties themselves, as evidenced by their acts and conduct for a period of thirty-two years before the instant controversy arose. In such cases the construction placed thereon by the parties themselves will be given controlling effect. Superior Oil Co. v. Stanolind Oil & Gas So., Tex.Civ.App., 230 S.W.2d 346, aff'd. 150 Tex. 317, 240 S.W.2d 281; Rio Bravo Oil Co. v. Weed, 121 Tex. 427, 50 S.W.2d 1080, 85 A.L.R. 391; Bowden v. Patterson, 51 Tex.Civ.App. 173, 111 S.W. 182 (wr. ref.); Livingston Oil Corp. v. Waggoner, Tex.Civ.App., 273 S.W. 903 (wr. ref.). Appellants have admitted that they each knew that gas was being produced by appellees from the leasehold premises for many years before this suit was filed, and they admit that they knew that much of such gas was being "used" off the leasehold premises; they also admit having received and accepted the flat-rate royalty checks payable under the second and third royalty provisions of the lease, for such gas. They deny, however, that they knew that such gas was being "sold" when they accepted the flat-rate royalty checks from appellants for gas "used off the premises".

Following the execution of the lease in 1925, oil was discovered in the area in 1926. In 1927, production of oil was obtained from appellees' portion of the leased premises. Thereafter, a number of oil wells were completed on appellees' portion of the lease, at depths ranging from 2800 to 3800 feet. From these oil wells some gas was produced. In 1928, one of these wells ceased producing oil, and was converted from an oil well producing some gas to a gas well producing gas only. Prior to 1928 the only gas produced from the leased premises was the gas (casinghead gas) produced along with the oil from the oil wells. In 1942 a second well ceased producing oil, and was converted from an oil well producing some gas to a gas well producing gas only. In each instance, the record reflects that the lessor or his assigns were notified of the changes in the classification of the wells, and each knew that such wells could no longer be considered as oil wells producing some gas upon which a royalty of only $50.00 per well per year was payable, but that such wells must be considered as gas wells producing gas only, entitling the lessor or his assigns to a flat royalty of $100 per year per well for the gas when used off the premises. The record before us also reflects (without dispute) that the gas from oil wells producing some gas was paid for by appellees on the basis of $50.00 per well per year when used off the premises, and that the gas from gas wells producing gas only was paid for by appellees on the basis of $100 per well per year when used off the premises, and that such payments had been accepted by appellants and their predecessors in title for approximately 32 consecutive years before the filing of this suit.

It is undisputed that soon after gas was discovered and developed on the leasehold premises, Southern Crude Oil Purchasing Company (appellee Pan American's predecessor in title), and Westbrook-Thompson Holding Corporation, the then owners of a substantial portion of the entire Hendrick lease, constructed a pipeline gathering system, and that gas from wells on the T. G. Hendrick lease here involved, as well as another lease identified in the record as the Ida Hendrick lease, was gathered and commingled in this pipeline. Part of this gas was used on appellees' portion of the Hendrick lease involved in this suit, and part of it was used on the other Hendrick lease (not involved here) as fuel for boilers, machine shops, garages, and in the operation of camps on both leases. During such period, gas from the gather-

ing system was sold to other operators of portions of both leases. In 1942, C. V. Lyman erected a gasoline plant in the area, *which was located on land not covered by either of the two Hendrick leases.*

Lyman maintained and operated the plant until 1956, when he sold it to Rycade Oil Company. Rycade operated the plant until January 1960, when it was sold to Phillips Petroleum Company. The plant is connected to pipelines from the wells on both Hendrick leases, including the 480 acres owned by appellees. Casinghead gas was transferred from these wells to the Lyman gasoline plant, where the gasoline was extracted from the casinghead gas, and the residue gas was then sold or disposed of. In 1949 appellees entered into a written contract to sell Lyman gas produced from the shallow wells for use in the gasoline plant, and during all of such time, and for several years thereafter, appellees paid royalties on the gas they sold to Lyman and his successors at the flat-rate royalty provided in the second and third paragraphs of the oil and gas lease. The flat-rate royalty payments were accepted by each of the appellants, none of whom, at any time down through the years, made any inquiry of appellees as to how or in what manner the gas from any of the wells was being used off the premises. Appellees have continuously sold gas from their wells on the subject lease since the date of the original contract with Lyman in 1949, and to each of his successors.

While appellees have admittedly sold casinghead gas, as well as natural gas, from the shallow wells located on the lands covered by the lease in question, appellants have not sued to recover a proportionate part of the royalty on either natural gas or casinghead gas produced and sold from the shallow wells, but have confined their pleadings to, and apparently seek only to recover, a proportionate part of the royalties allegedly due each appellant solely from the gas, distillate or mineral sales from the deep wells, identified in the record as the Area "A", "B" and "C" wells,

it being undisputed that these wells are gas wells from which gas only is produced.

Drilling of the first of the three deep wells was commenced April 13, 1956 and was completed as a pure natural gas well on September 15, 1956. This well, known as the Area "B" well, produces tremendous volumes of natural gas from a Devonian Formation at approximately 9100 feet, and from an Ellenburger Formation at approximately 11,525 feet. The second well (Area "C" well) was commenced January 22, 1958 and was completed July 23, 1958, as a pure natural gas well. The Area "A" well, the third deep test to be drilled on the land here involved, was commenced July 15, 1958 and was completed January 31, 1959. All three wells were dually completed in both the Devonian and Ellenburger Formations, at approximately the same depth, as pure natural gas wells. Each of these wells produces tremendous volumes of natural gas from both formations.

The appellees began to market and sell the gas from the first of the three deep wells in January of 1958. Flat-rate royalty checks on the basis of $100 per well per year were sent to each of the appellants and were accepted by them, just as they had in previous years received and accepted the flat-rate royalty checks on the casinghead and natural gas produced from the shallow wells located on the same premises.

Appellants now contend that they accepted the checks without knowledge of the fact that the gas from the leased premises was being sold. We think this contention must be rejected. They admit knowing that the gas was being "used" off the premises, and admit that if they had made proper inquiry the full truth could have been ascertained, but say they did not do so, and that they were under no duty to make such inquiry.

Appellants are not in the position of the usual or ordinary landowner dealing with an oil and gas lessee. Each of the appel-

lants are also engaged in the oil and gas industry and have been so engaged for many years. They each own substantial mineral interests, not only in the particular land involved here, but in other lands included in both the Hendrick leases. The development of the area covered by both leases, as reflected by the oil maps of the area in evidence, has been extensive. Correspondence between appellants, their predecessors in title, and the appellees reflects that a meticulous and continuing interest was maintained by each of the appellants in the properties throughout the years. Each appellant was familiar with the duty imposed upon the operators of oil and gas leases to file drilling reports, well logs, production reports, completion reports and a variety of other reports and documents with the Railroad Commission and the State Comptroller's office, an examination of which would have revealed the amount of casinghead and natural gas that was being produced by appellees from the leased premises, and exactly how it was being "used" by them off the leased premises. We believe, also, that a physical inspection of the premises, by anyone familiar with the oil and gas industry, would have revealed the truth.

If a proper inquiry or investigation had been made by appellants for the purpose of ascertaining how the gas from the leased premises was being used, it would have led to a knowledge of all the facts, and of the previous construction placed upon the lease by their predecessors and the original lessee; and this, in equity, is equivalent to actual notice. Hexter v. Pratt, 10 S.W.2d 692 (Tex.Com.App.); Superior Oil Co. v. Stanolind Oil & Gas Co., Tex.Civ. App., 230 S.W.2d 346 (aff'd. 150 Tex. 317, 240 S.W.2d 281).

In the Superior Oil Company case cited above, Superior and the royalty owners, claiming subject to the lease, were contending that they had no notice of a prior construction that had been placed on the lease by their predecessors. In rejecting this contention, the Court of Civil Appeals held:

"The records of the Railroad Commission show the date of the dry hole. Since the dry hole provision of the lease put Superior and Intex on notice that drilling of a dry hole might change the date for payment of rentals they were required to make inquiry. We sustain the trial court's conclusion that if proper inquiry had been made, appellants would have learned the facts.

" 'In law whatever fairly puts a person on inquiry is sufficient notice, where the means of knowledge are at hand, which if pursued by the proper inquiry the full truth might have been ascertained. Means of knowledge with the duty of using them are in equity equivalent to knowledge itself.' Hexter v. Pratt, Tex.Com.App., 10 S.W.2d 692, 693. See also 66 C.J. 1115; Hill v. Stanolind Oil & Gas Co., 119 Colo. 477, 205 P.2d 643, 650; Brown v. Hart, Tex.Civ.App., 43 S.W.2d 274; 31 Tex. Jur. 362."

At the time the oil and gas lease here involved was executed, casinghead and natural gas had little or no market value. The usual practice in the oil industry at that time, as reflected by the printed provisions of the Producer's 88 Special-Texas Form of lease actually employed by the original parties to the lease now before us, (as well as the terms and provisions of the various leases of that general period, and construed by the courts in the Akin, Poe, Connellee, Harris, Mussellem (Okla.), and the Reynolds cases, all of which have been cited by the parties to this suit and discussed in this opinion), show that there was only a casual interest in gas at that time. Each of the leases in the cited cases provided only a nominal flat-rate per well royalty on gas, regardless of whether the royalty provision of the respective leases employed the term "used or sold off the leased premises" or merely the term "used off the premises". Except in the Reynolds case, the terms have been held to be synonymous.

Assuming that the term "used off the premises", as that term is employed in the second royalty clause of the Hendrick lease, is unambiguous, as contended by appellants, but that the right to "sell" such gas is but one of the many "uses" to which said gas might be subjected, as we believe the case to be—then it follows that appellants must either add to, or in some manner detract from, the plain import of the language of the instrument in order to sustain their contention (some thirty-four years after the execution of the instrument) that the right to sell natural gas produced from the lease did not pass to appellees upon payment of the flat royalty thereon.

 The mere fact that gas, since the execution of the lease, has ceased to be a product of little value and is today of considerable value cannot operate to change the contract.

·"As men bind themselves, so must they stand bound." Menard v. Sydnor, 29 Tex. 257.

For years, appellants have accepted a single flat-rate royalty on natural gas, and now contend they are entitled to two royalties—a flat-rate royalty when the gas is used off the premises, *but not sold;* and another royalty of ⅛ of the net proceeds thereof when the gas is sold off the premises. Under such circumstances, we believe appellants were under a duty to make some inquiry, either at the time they received, or before they accepted, the numerous gas royalty checks sent to them over the years, for the purpose of determining whether the gas was being sold or was otherwise being used off the leased premises. This they failed to do. Since a duty to inquire existed, and because a proper inquiry would have revealed the truth, they may not now complain that they had no notice of the fact that the gas was being sold off the leased premises.

Appellants' third point is accordingly overruled.

Appellants' fourth point is based on the contention that there are issues of material facts on appellees' defense of "practical construction", and that the district court wrongfully sustained appellees' motion for summary judgment.

After having carefully considered appellants' Point Four, and the argument and authorities cited in support thereof, we have concluded that this question has been resolved by our discussion of other points, and that a further discussion of this particular question would serve no useful purpose. In any event, in the trial court appellants, as well as the appellees, contended that there were no issues of material facts on the evidence presented before the trial court, and with this contention we are inclined to agree. Appellants' Point Four is accordingly overruled.

Finding no error, the judgment of the trial court is in all things affirmed.