**GULF OIL CORPORATION et al.,**
Appellants,

v.

**SOUTHLAND ROYALTY COMPANY et al.,**
Appellees.

No. 6187.

Court of Civil Appeals of Texas,
El Paso.

March 15, 1972.

Rehearing Denied April 12, 1972.

Morgan L. Copeland, Jesse P. Luton, Jr., Edwin S. Hurst, Kenneth C. Keener,

Houston, Jackson, Walker, Winstead, Cantwell & Miller, A. W. Walker, Jr., Dallas, Ira Butler, Fort Worth, Ken G. Spencer, Crane, Royce H. Savage, Tulsa, Okl., Mullinax, Wells, Mauzy & Collins, Otto B. Mullinax, Dallas, Arthur E. Moers, Jr., Houston, Kerr, Fitz-Gerald & Kerr, William L. Kerr, Midland, Simon & Simon, Henry W. Simon, Sr., Robert M. Doby, Jr., Fort Worth, for appellants.

Hudson, Keltner, Smith & Cunningham, Luther Hudson, Joe Bruce Cunningham, Fort Worth, Stubbeman, McRae, Sealy, Laughlin & Browder, W. B. Browder, Jr., Tom Sealy, Hamilton E. McRae, James Noland, F. H. Pannill, Midland, Walter B. Morgan, J. Lamar Hart, Dillard Baker, Houston, Stroud & Smith, John R. Feather, Cecil L. Smith, Ronald W. Kessler, Edward H. Forgotson, Dallas, G. Bert Smith, Jr., Andrews, C. Bennett, Crane, Hopkins, Sutter, Owen, Mulroy & Davis, Harry D. Orr, Jr., William P. Sutter, Chicago, Ill., Joseph A. Beyer, Spur, for appellees.

OPINION

RAMSEY, Chief Justice.

This is an appeal from a judgment of the District Court of Crane County wherein a declaratory judgment was sought to construe an oil and gas lease. Gulf Oil Corporation, Plaintiff-Appellant, and six other Plaintiffs-Appellants filed suit against Southland Royalty Company and eighty-seven other Defendants-Appellees, seeking judgment declaring, as a matter of law, that an oil and gas lease did not expire on the date specified in the lease. At the close of Plaintiffs' case, the Court granted Defendants' motion, withdrew the case from the jury, and entered judgment for Defendants. Plaintiffs have appealed. We affirm.

The lease involved was executed on July 14, 1925, between W. N. Waddell, et al., lessors, and Gulf Production Company (now Gulf Oil Corporation), as lessee. The lease involves 45,771 acres of land in Crane County on which there are 925 producing oil and gas wells. The only issue in the case is the time of the termination of the lease.

The lease is a printed form with the designated lessee, Gulf Production Company, printed in the form. It is undisputed that the lease provides that it is for a term of fifty (50) years. No ambiguity is claimed by either party. Plaintiffs contend, however, that by reason of Section 7 of the lease, that they are entitled to either 4,661 or 4,286 additional days of production beyond July 14, 1975, due to delays and interruptions arising out of their compliance with regulatory orders of the Texas Railroad Commission. Defendants contend that Section 7 is nothing more than a force majeure or excuse clause and not a provision whereby the expressed term should be extended.

The provisions of the lease forming the basis for the controverted construction are as follows:

*Section 1, Paragraph 2:*

"TO HAVE AND TO HOLD unto said Lessee and to Lessee's successors and assigns for the term of Twelve (12) years from the date hereof and as much longer thereafter as oil or gas (or other minerals, if produced hereunder) are produced from said land. Provided, that this lease shall not remain in force longer than fifty (50) years from this date, and provided further, that a temporary cessation of production due to cleaning out, working over or drilling deeper of any well, or similar causes occurring after production secured, shall not terminate this lease. And Lessor covenants that Lessor has good title to said land and will protect Lessee in the quiet and peaceable possession thereof."

*Section 7, Paragraph 1:*

"When drilling or other operations are delayed or interrupted by storm, flood, or other act of God, by fire, war, rebellion, scarcity of water, insurrection,

riots, strikes, scarcity of labor, differences with employees, or failure of carriers to transport or furnish facilities for transportation, or as the result of some order, requisition or necessity of the Government, or as the result of any cause whatsoever beyond the control of the Lessee, the time of such delay or interruption shall not be counted against the Lessee—anything in this lease to the contrary notwithstanding."

In addition to the paragraphs above shown, Paragraph 3 of Section 1 of the lease provided that the Plaintiff agrees to begin operations for the drilling of a well within twelve (12) months and if it failed to do so, Plaintiff agreed to pay $5,721.37 each six (6) months, and not to exceed eighteen (18) such periods. Failure to make such payments would allow the Lessor to forfeit the lease. Also, paragraph 6, Section 1 of the lease, provided that if operations should not begin before the expiration of ten (10) years, the lease would then terminate; but if, prior to the termination of the ten (10) years, the Lessee shall have begun operations to find oil or gas and is actually engaged in such operations at the end of the ten (10) years, then such attempts could continue no longer than twelve (12) years provided such attempts were successive with no more than sixty (60) days elapsing between the abandonment of one well and the commencement of operations on another.

Plaintiffs contend that during the period of January 1, 1938, through June 30, 1967, the Railroad Commission of Texas denied them the right to produce the respective daily allowables on the wells drilled for the equivalent of 4,661 days, or in the alternative, for 4,286 days. Plaintiffs in their arguments contend that under the terms of the lease they are entitled to thirty-eight (38) years production time, and for the delays and interruptions occasioned by their compliance with the Railroad Commission orders, the Court should then construe the termination date of the lease in order that such time should not be "counted against"

them as provided in Section 7. Defendants contend that the lease is a fixed, definite term lease, and that Section 7 is nothing more nor less than a force majeure or excuse clause and not intended by the parties, nor to be construed by the Courts as a provision to extend the termination date of the lease.

The record submitted on appeal is voluminous. The parties have filed most comprehensive briefs in support of their respect contentions. Plaintiffs have assigned seven points of error committed by the trial Court. All points of error relate to the actions of the Court in withdrawing the case from the jury and refusing to construe the provisions of Section 7 of the lease to extend the termination date of the lease and in refusing to allow the Plaintiffs the additional producing days which they sought.

In construing contractual obligations, it is the duty of the Court to ascertain the intention of the parties. In so doing, the instrument must be considered in its entirety. Klein et al. v. Humble Oil & Refining Co. et al., 126 Tex. 450, 86 S. W.2d 1077 (1935); Smith v. Liddell et al., 367 S.W.2d 662 (Sup.Ct.1963); Leon v. Gulf Production Co., 35 S.W.2d 1101, (Tex.Civ.App., err. ref.). At the same time, the language used by the parties should be given its plain grammatical meaning unless it definitely appears that the intention of the parties would thereby be defeated. Fox et al. v. Thoreson, 398 S.W.2d 88 (Tex.Sup.Ct.1966). Neither party contends that there is any ambiguity in the instrument. The latest expression of the Supreme Court on this point is taken from City of Pinehurst v. Spooner Addition Water Company et al., 432 S.W.2d 515 (1968) when it held:

"It is elementary that if there is no ambiguity, the construction of the written instrument is a question of law for the Court. Myers v. Gulf Coast Minerals Management Corp., 361 S.W.2d 193 (Tex.Sup.1962). It is the general rule

of the law of contracts that where an unambiguous writing has been entered into between the parties, the Courts will give effect to the intention of the parties as expressed or as is apparent in the writing. In the usual case, the instrument alone will be deemed to express the intention of the parties for it is objective, not subjective, intent that controls. Woods v. Sims, 154 Tex. 59, 273 S.W.2d 617, 620 (1954). See generally: 3 Williston on Contracts § 610 (1936); Restatement of the Laws of Contracts § 230 (1932)."

Additionally, surrounding facts and circumstances may be examined as an aid to construction or interpretation, in order to find out the intention with which the words are used. Gulf Production Co. et al. v. Spear, 125 Tex. 530, 84 S.W.2d 452 (op. ad.); City of Pinehurst v. Spooner Addition Water Company et al., supra; Spence & Howe Construction Company v. Gulf Oil Corporation, 365 S.W.2d 631 (Tex. Sup.Ct.1963).

■ To attempt to formulate rules for the construction of contractual obligations can be an exercise in futility. Case authority can be cited to substantiate almost any controverted interpretation. The ultimate end to be achieved is to effectuate the intentions of the parties based upon a reasonable and fair construction of the contractual instrument consistent with the usual and primary meaning of the words used, Spence & Howe Construction Company v. Gulf Oil Corporation, supra; 13 Tex.Jur.2d, Sec. 122, p. 287; 42 Tex.Jur.2d, Sec. 165, p. 349; 17 Am.Jur.2d, Sec. 247, p. 639; Phillips Petroleum Company v. Harnly et al., 348 S.W.2d 856 (Tex.Civ.App., n. r. e.). The problem is well stated by Chief Justice Calvert in Moore et al. v. Smith et al., 443 S.W.2d 552 (Tex.Sup.Ct.1969):

"It is nearly always possible to find some provision in a lengthy written instrument which seems to some extent to be out of harmony with the main thrust of the instrument, but such provision or

provisions should not be permitted to obscure the otherwise clearly indicated intention of the parties to the instrument."

The lease under examination provided that the Plaintiff, Gulf Production Company, would have the exclusive right to explore and produce oil, gas, and other minerals on the land described therein. The primary term of the lease provided for a term of twelve (12) years, and as long thereafter as oil, gas or minerals were produced. The additional provision was then inserted:

"Provided, that this lease shall not remain in force longer than fifty (50) years from this date, . . . . ."

Thus, the lease in question is a lease for a definite or fixed term.

■ The greater weight of authority in construing oil and gas leases ascribes to the habendum or term clause, the dominate role in determining the length term of the lease, unless it is properly modified by other provisions. As stated in 58 C.J.S. Mines and Minerals § 198, pp. 440–441:

"The term clause, which is the habendum clause, dominates the period for which the lease shall run, unless it is properly modified by other provisions, and the fixed time therein stated is not to be extended by indirect, ambiguous, and negative language in the development clause."

Of similar effect is the conclusion stated in 38 Am.Jur.2d, Gas and Oil, Sec. 96, p. 563:

"Under what has been described as the 'weight of authority,' the habendum clause dominates the period for which a gas and oil lease is to run, so that unless it is properly modified by other provisions, all rights of the lessee cease at the expiration of a fixed time stated therein."

Other authorities support this general proposition. See Walker, Property Interests Created by Lease, 8 Tex. Law Rev. p. 516, 2 Summers, The Law of Oil and Gas,

Perm. Ed., Sec. 303.1, p. 319 and Sec. 302, pp. 278–279.

The only question then remaining is whether or not the provisions of Section 7 "properly modify" the habendum clause or evidences an intention on the part of the contracting parties that it should do so.

The terminology of oil and gas leases has evolved through various phases of the industry. It has of necessity been influenced by the reactions of the parties and judicial interpretation. In the earlier days, long, definite terms were typical. Their ultimate disfavor is commented on by Summers, Oil and Gas, Vol. 2, Sec. 284, p. 181:

" . . . . But, whatever the inducement for making leases for long definite terms, experience soon taught the lack of wisdom exercised in making them."

Brown, Oil and Gas, Chap. V, p. 59, observes as to the next innovation:

"The next development was to add to the long definite or primary term a 'thereafter' clause, that is, the lease would run for a term, say of 25 years, and as long thereafter as oil or gas was produced."

An excellent discussion is contained in Walker, Tex.Law Rev., Vol. VII, p. 1.

Defendants introduced twelve exhibits, being oil and gas leases purchased by Gulf Production Company. These leases were in different localities. One was executed in 1924 and the remaining were executed from 1926 to 1931. Each lease contained a paragraph with the identical wording of the Section 7 under examination. Each of the exhibits contained an habendum clause providing for a term of years and further provided "and as much longer thereafter as oil or gas (or other minerals, if produced hereunder) are produced from said land." None of the exhibits contain the provisions as contained in the lease in this suit limiting the term of the lease to a definite number of years. These exhibits are at least mute evidence of intention, either on the part of the lessor, or lessee, or both,

that this lease would differ from other leases acquired by Plaintiff Gulf prior and subsequent to the lease in question. Further, it dispels the thought that perhaps due to the early date of the lease, that the "thereafter" provision had not found favor or usage in the industry. The clear and unmistakable intent is evidenced that the parties contemplated a definite and fixed term lease.

In considering the provisions of Section 7 and its effect, if any, on the habendum clause, it will be noted that the section contains fourteen specifically enumerated matters and one blanket provision which would excuse performance. To adopt Plaintiffs' reasoning and to hold that governmental regulation would suffice to extend the term clause, would, out of consistency, require the holding that each of the other causes be of equal dignity and effect. Such construction would be most drastic and far-reaching not only as to oil and gas leases but to any contractual obligation that might arise containing a similar provision. Thus, a contract which in its inception was for a fixed or definite term could easily be resolved into one in perpetuity. Regulatory orders have been established as legal and desirable for conservation of natural resources. We can confidently assume that they will continue. Plaintiffs seek an additional producing time equivalent to approximately twelve (12) years. Thus, at the expiration of the extension sought, additional time would then have accrued resulting from regulatory orders issued during the extension. Theoretically, at least, there would be no termination date. We cannot construe the language of the lease as so intended by the parties.

The only testimony introduced by Plaintiffs was that of Mr. Jack K. Baumel. Mr. Baumel is eminently qualified in his field, having been associated with the Railroad Commission of Texas from 1939 to 1954 and thereafter engaged in private practice as a petroleum consultant. His vast knowledge of commission activities and the oil and gas industry is evident.

The gist of his testimony was to show that by the shut down orders and the market demand orders for the period of time from January 1, 1938, through June 30, 1967, denied Plaintiffs of the producing days which they now seek. Based on his computations, Plaintiffs would be entitled to 4,661 days. The alternative plea is for 4,286 days. The difference in number of days was due to the fact that marginal wells, discovery allowable oil wells, and non-associated gas wells were not affected by the Commission orders, and these wells were not restricted in their production. Thus, the allowance was calculated to provide for a reduction in lost producing time. To illustrate Plaintiffs' contentions, Plaintiffs seek a one day extension for each day of production lost. Thus, as the exhibits show, as an example, in 1941, 14 wells were shut down for nine (9) days. This would result in a loss of 126 well producing days. Under Plaintiffs' contention, assuming there are now 925 wells on the lease, it would mean that Plaintiffs would be entitled to nine additional days to produce the 925 wells. This would result in Plaintiffs obtaining 8,325 well producing days, if the number of wells remains the same. Though there is not the great disparity in well numbers throughout the period of time involved, as in the example, yet it would be a strained construction indeed to hold that the parties so intended.

The Legislature of this State recognized the public interest in the production of oil and gas as early as 1899 by enacting Art. 6004–6007, Brown et al. v. Humble Oil & Refining Co., 126 Tex. 296, 83 S.W.2d 935 (126 Tex. 296, 87 S.W.2d 1069, modified) (1935).

The conservation and development of natural resources has been a declared policy of this State since the enactment of a Constitutional Amendment in 1917. Art. XVI, Sec. 59(a), Vernon's Ann.St. To effect such policy, the Constitution provides that "the Legislature shall pass all such laws as may be appropriate thereto." In compliance therewith, the 36th Legislature

(1919), Article 3, Chapter 155, at page 286, provided:

"It shall be the duty of the railroad commission to make and enforce rules and regulations for the conservation of oil and gas, it shall have authority to prevent the waste of oil and gas in drilling and producing operations and . . . . it is authorized to do all things necessary for the conservation of oil and gas whether here especially enumerated or not, and to establish such other rules and regulations as will be necessary to carry into effect this Act and to conserve the oil and gas resources of the State."

Defendants introduced exhibits being Railroad Commission Circulars 11 issued July 26, 1919, and Oil and Gas Circular 13 issued on March 1, 1923, which undertook to regulate the production of oil and gas to prevent waste and to regulate the production of natural gas according to market demand. We conclude that the public policy had been declared and implemented to some extent prior to the execution of this lease. Appellants in their brief acknowledge an awareness that some order of the government might be issued in the future that could delay or interrupt drilling or other operations. The wording of the lease itself by the inclusion in Section 7 relating to governmental orders is indicative of the awareness of Appellants and the suspicioned possibility of government intervention or control.

The Courts must presume that contracting parties are knowledgeable of the law and contract accordingly. 13 Tex. Jur.2d, Sec. 165, p. 353. Thus, it is our opinion that the lease contract was entered into in contemplation of the regulatory authority vested in the Railroad Commission.

Neither party questions the validity of the Railroad Commission orders, but on the contrary have abided by its directives. Appellees rely on Butler v. Jenkins Oil Corporation et al., Tex.Civ.App., 68 S.W. 2d 248; 128 Tex. 356, 97 S.W.2d 466 (Tex.Com.App.1936), which Appellants

contend is not applicable. While a different matter is presented there for Court construction, yet the basic effect is the same. That being the rights of the contracting parties to an oil and gas lease will be subordinated to the regulatory authority of the State even though the contractual rights or obligations may be affected in so doing.

Plaintiffs argue that they must produce the oil and gas within the fifty year term "under penalty" of losing title to any they fail to produce. We perceive no penalty. The lease provided for twelve years and "as much longer thereafter" with the express provision that it should not remain in force longer than fifty years. The lease simply terminates by its own limitation.

Forfeiture has always been of concern to lessees in oil and gas leases. Prior to the decision in 1929 of W. T. Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S. W.2d 27, the Courts of this State decreed forfeiture for breach of implied covenants in addition to breach of express covenants, non-user or abandonment. Under the terms of this lease, once production was obtained, the Plaintiff was then entitled to the fifty year term as long as oil, gas or minerals were produced. The habendum clause itself contained a force majeure provision excusing temporary cessation, yet such excuse for temporary cessation of production did not provide an extension of the fifty year term.

By way of contrast to production as used in the habendum clause, the following clauses 3, 4, 5 and 6 of the lease deal with operations necessary within the primary term to hold the lease; or, in lieu thereof, the payment of delay rentals. Thus, the overall import of the document leads to a persuasive conclusion of a differentiation within the lease between "production" or "produce" and "operations." We would not hold that the term "other operations" could not include production, yet the basic import of its use in this lease, when considering the instrument in its entirety,

leads to the inevitable conclusion, that such refers to exploration and development rather than to production.

■ We conclude that Section 7 is a force majeure or excuse clause. We do not construe it as being intended to modify or extend the fixed term of the lease.

The interpretation and effect of a force majeure clause is summarized in Brown, Oil and Gas Leases, Sec. 13.05, page 243, as follows:

"In summary, it is apparent that the force majeure clause was designed to grant relief from contractual obligations where the law would not otherwise excuse nonperformance. The courts appear reluctant to overturn what they have called 'a well established rule' that impossibility of performance will not excuse a party from complying with the obligations of a contract, especially where the performance becomes impossible after the contract is executed. While there seems to be no reason why a court would refuse to enforce the provisions of a force majeure clause in an oil and gas lease, nevertheless it seems evident that courts generally will apply the rule of strict construction to such provisions.

"Accordingly, to be effective, a force majeure clause should be clear and definite (1) as to the acts and circumstances which are covered thereby, and (2) that the happening of those acts and circumstances will extend the habendum or term clause of the lease for definite or ascertainable periods, based upon the delay period during which performance is prevented."

Plaintiffs filed a motion to strike a portion of the transcript. This was occasioned by Defendants' filing their request for transcript and the entry by the trial Court of its order finding such request proper and ordering the Clerk of the trial Court to forward the original papers on file to this Court. Included in the order

were depositions, portions of which were not introduced in evidence, as well as exhibits, motions and material that were not introduced. Defendants justify their request and the action of the trial Court based on the Supreme Court order under Rule 376–a, T.R.C.P., which provides:

"The judge may order any instrument included in the transcript which he deems proper."

 The duty of this Court is to consider only the testimony adduced and the evidence tendered and/or admitted at the time of trial on which the judgment of the trial Court is based. To encumber the record on appeal with matters not introduced at the time of trial is contrary to the end result desired as expressed in Rule 370, T.R.C.P. Such matters should not, and will not, be considered on appeal. Texlite, Inc. v. Wineburgh, 373 S.W.2d 325 (Tex.Civ.App., n. r. e.).

For the foregoing reasons, we affirm the judgment of the trial Court.

PRESLAR, Justice (dissenting).

I respectfully dissent and would reverse and remand this cause to the trial Court. It is my opinion that by the language used the parties have expressed the intention that time lost due to acts of Government shall not count against the term time. They agreed that the full term of "as much longer thereafter as oil or gas * * * are produced" would be modified or limited to fifty years, but the limitation of fifty years would not be reduced by delays resulting from impossibility of performance. My position is that the intent of the parties can be determined by the words they used and there is no need to resort to arbitrary rules of construction; and secondly, to reach the conclusion of the majority, certain language of the contract must be disregarded, nothing in their opinion "to the contrary notwithstanding."

As noted by the majority, there is no contention that the instrument is ambiguous. That would seem to eliminate any need for construction or interpretation by a Court, but I agree that there is a need to construe this agreement, but only under the most basic or elementary rules—to determine the intent of the parties from the words used. The majority has set forth the authorities for these basic rules and there is no need to repeat them here. A rule of law, most important here, is that Courts cannot disregard words used by the parties. 17 Am.Jur.2d, Contracts, Sec. 242, p. 629; Harrison v. Fortlage, 161 U.S. 57, 16 S.Ct. 488, 40 L.Ed. 616; Haltom Oil Company v. Phillips Petroleum Company (CA5 Tex.) 304 F.2d 95.

Viewing the instrument in its entirety, we find it divided into twelve numbered sections with numbered paragraphs under each. The section is capitalized and centered on the page, i. e., "SECTION 1," with the subsections then listed as "Paragraph 1, Par. 2," etc. The term clause is Par. 2, under SECTION I, and is one of six such paragraphs under that section. The provision concerning the event of impossibility of performance due to acts of God, government, war, rebellion, riots, etc., is in a separate section, in fact it is the whole of "SECTION 7." This is mentioned because the majority cites and relies on authority that the term clause is not to be extended by "indirect, ambiguous, and negative language in the development clause." The development clauses in this lease are not in Section 7, but are found among the six paragraphs of Section 1; and they provide their own forfeiture terms. The other authority cited by the majority is that the term, or habendum, clause dominates the period for which an oil and gas lease shall run, "unless it is properly modified by other provisions." Section 7 modifies this lease to the extent that it eliminates delays or periods of time where there is an impossibility of performance due to the causes specifically named. It does not conflict with the term of years, but deals with a possibility that could arise and cut short the term. One of those causes is "the result of some order, requisi-

**592**

tion or necessity of the Government." Stripped of the other named causes, SECTION 7 reads:

"When . . . . operations are delayed or interrupted by . . . ., or as the result of some order, requisition or necessity of the Government, . . . . the time of such delay or interruption shall not be counted against the Lessee, anything in this lease to the contrary notwithstanding."

*These are the words of the contract.* They cannot be disregarded. They specifically apply to an "order" of the Government. By orders of the State of Texas, the Lessee was prohibited during the term of the contract from carrying on operations for specific periods of time. The fact that proration has existed in Texas since January of 1938 is a matter of common knowledge, and the specific orders of the State implementing it are a part of the record in this case. The first such order took the form of ordering that each and every well must be shut down for six successive Sundays. Thereafter, the Railroad Commission of Texas set the allowable amount of production each month and issued its order as to certain wells being shut down for a prescribed number of days each month or produce only the total of the daily allowables for the number of days allowed. This method of limiting production by ordering shut-downs for a specified number of days or production measured in days was used until June of 1967 when a more sophisticated method was put into effect, and under which no claim is made in this suit. By these orders the production curtailment was measured in days and they were specific that wells would be shut down—prorated wells were denied the right to produce for the number of days specified for the particular month. For instance, the Railroad Commission's order of January, 1957, said: "each well shall be shut down 13 days, giving to each well 15 producing days of the 28 days in February." By virtue of the contract (lease) Lessee was entitled to produce every day of February, yet here is an "order" of the Government which shut down wells, denied Lessee the contract-given right, for nearly one-half the month. The same was true of all other months, except for the varying number of days of prohibition. Because of this fragmentary stoppage by days per month throughout the years the issue is not as clear-cut as it would be if the order of the Government were for a total stoppage for a term of months or years, but is just as real. It flies in the face of the contractual provision just as clearly as would an order of the Government decreeing a total shut down for a calendar year or years. Suppose the Government had determined to effect proration or limit production by closing various oil fields of the State at different times and had decreed that the area covered by the lease should be shut down for a period of five calendar years. The term of the lease is for fifty years with a provision that "when operations are delayed as the result of some order of the Government, the time of such delay shall not be counted against the Lessee." Can there be any doubt that the five years would not count against the fifty year term? Or stated more accurately, from a Court's standpoint—does a reasonable common sense "construction" or "interpretation" of the contractual provision show the intention of the parties to be that such five year period of time shall not count. The shut down here was just as real as ore for a period of calendar years, it totals either 4,286 or 4,661 days that various wells were shut down by Government order. The majority finds the intention of the parties to be that the fifty year provision is absolute, that they intended that it not be affected by the shut down orders of the Government. It seems to the writer that such an intention cannot be found without disregarding the quoted express words of the contract. Those words must have some purpose, they must have been put there by the parties for some reason, yet as the contract has been interpreted, Section 7 has been struck from the contract.

The express words of the lease being, "When *drilling or other operations* are delayed or interrupted . . . . the time of such delay or interruption shall not be counted . . . .," the argument is made that the phrase "drilling or other operations" does not cover and include producing operations and thus affect the term. This would seem to be the only way that the express words could be avoided, but I cannot agree with it. The majority is uncertain about it, but concludes that "other operations" refers to exploration and development rather than to production. Again, I must disagree. It must be remembered that we are construing a provision covering the event of impossibility of performance as a *cause of termination of the lease*—forfeiture. The lease begins with the stated purpose that the Lessors demise and let unto the Lessee, Gulf, the described land, "with the exclusive right of exploiting the same for and producing oil and gas therefrom, and to that end also grant the exclusive right of drilling and operating thereon for oil and gas, . . . . ." The very physical form of the printed document belies any intention that Section 7 applies only to drilling operations. As noted, it is divided into twelve main or subject "Sections," with each such section subdivided into numbered paragraphs under it. Drilling operations, when forfeiture could occur for failure to drill or pay delay rentals within certain periods of time, are covered within the six subparagraphs under Section 1. That portion of the contract here involved is not under *Section 1 with drilling provisions.* Rather, it is a separate, complete, and entire section—number 7 of the 12 sections. Section 7 must apply to delays occurring during the entire term of the lease. It says "the time of such delay or interruption shall not be counted against the Lessee—anything in this lease to the contrary notwithstanding." To me, the "anything to the contrary notwithstanding" statement makes certain, absolute, the intention that the time of delays shall not be counted. It also shows that the provision is to apply to the entire lease,

not just to drilling and exploration, for it says anything "in this lease," and that can only mean the entire lease. Again, here are words of the contract which cannot be disregarded. There is nothing to indicate that it was intended to apply only to drilling operations, and the reasonable meaning of the contract as a whole points to a contrary intention. The subject of the contract, its entire purpose, is to obtain, produce, oil and gas. It is not a drilling contract. By far the greater time and quantum of activity concerns producing oil and gas under the lease. Forfeiture for delays in drilling activities could only occur prior to obtaining initial production. Such forfeiture is specifically covered in Section 1. *Once production is obtained, the lease is kept in force* by the "as much longer thereafter" provision. The drilling of a well could take anywhere from thirty days to a year, and if production were had, there would be no further concern with forfeiture for delays in drilling, but "other operations" would continue "as much longer thereafter" for fifty years. These other operations have in fact involved the drilling, completing, and producing of over 900 wells and the transporting and marketing of their production over a period of 46 years. Section 7 applies to something. How can a Court say it applies to "drilling," but does not apply to "other operations?" Especially when the subject is forfeiture and that can only occur prior to initial production so far as related to drilling. To say that the parties intended Section 7 to so apply is to emphasize a very minor part of the activities and time covered by the lease. It also requires that the express words "other operations" be disregarded. The language used by the parties should be given its plain grammatical meaning unless it definitely appears that the intention of the parties would thereby be defeated. Fox et al. v. Thoreson, 398 S.W.2d 88 (Tex.Sup.Ct. 1966). What, may I ask of the majority, is before this Court that makes it *definitely appear* that the intention of the parties would be defeated if "other operations" were left in the con-

tract. A Court is required to presume that parties to an instrument intended every word in it to have some meaning. Masterson et al. v. Gulf Oil Corporation et al., 301 S.W.2d 486 (Galveston, Tex.Civ.App., 1957, ref. n. r. e.); Smith et al. v. Davis, 453 S.W.2d 340 (Ft. Worth, Tex.Civ.App., 1970, ref. n. r. e.). The conclusion of the majority is that "other operations" refers to "exploration and development rather than to production." Exploration and development have gone on throughout the entire term—over 900 wells over an area exceeding 45,000 acres—and were still going on to date of trial. Yet, any delays in these operations throughout the years following initial production would not affect the term. It must be held that the parties have done a useless and vain thing by their Section 7 agreement. To this writer, who has lived most of his life in the oil fields, it is poppycock to hear the argument that "operations" does not include producing the oil and gas. Producing operations are the very purpose of the oil and gas lease, and such operations arise from and are carried on only by virtue of the lease. Next to the oil and gas lease, the instrument probably most common to the oil industry is the "Operating Agreement" which covers production operations of joint owners. One who is in control of the producing operations is called the "operator." The man in the field actually producing the oil is called a "lease operator." The lease before us has other provisions which seem to apply during the entire term, one being that the Lessee should have free use of gas, oil, wood, and water to "operate and drill any wells;" another provided that the Lessee agreed to pay for destruction of growing crops caused by "operations hereunder." Would this apply only during drilling? Texas cases allowing recovery under such wording during the entire period of production are legend. It must be concluded: A Lessee who produces oil and gas is engaged in an operation under his lease.

One of the reasons given by the majority is that some twelve other leases to which Gulf was a party contained a paragraph identical to Section 7 but were not for a term of years. This, they say, is "mute evidence" of intention that this lease would differ. Such evidence is so "mute" that it should not be heard above the roar of the express words used in this lease. It is analogous to saying that because A bought land from B with a house on it, it was intended that the land he buys from C would have a house on it (even though the deed says in express words there is no house). If there is need to look to the surrounding circumstances to determine the intent of the parties, this would seem to be a misapplication of the evidence admitted under the rule of looking to surrounding circumstances. As this Court said in Gruss v. Cummins et al., 329 S.W.2d 496 (1959), writ ref'd n. r. e.:

"The most important class of facts which are excluded on the ground of irrelevancy are the acts and declarations, either of strangers, or of one of the parties to the action in his dealings with strangers. Such facts are denominated 'res inter alia acta.' "

And as we said in Davis v. Zapata Petroleum Corporation, 351 S.W.2d 916 (1961), writ ref'd n. r. e., quoting from Stuart v. Kohlberg, Tex.Civ.App., 53 S.W. 596, 597:

" ' * * * it would be manifestly unjust to admit, since the conduct of one man under certain circumstances, or towards certain individuals, varying, as it will necessarily do according to the motives which influence him, the qualities he possesses, and his knowledge of the character of those with whom he is dealing, can never afford a safe criterion by which to judge of the behavior of another man similarly situated, or of the same man towards other persons.' "

This evidence is before us, but I would give it little weight as to the intent of these parties to this lease contract.

Another weakness in the position of the majority is the attempt to explain away

Section 7 by giving it a name, "force majeure" or "excuse clause," and then reciting the interpretation and effect commonly given to clauses of such name. The parties to this lease gave their words no name, and the majority is interpreting those words by adding a name and construing it instead of the actual words used. Even if we call it a force majeure or excuse clause, it serves the very purpose alluded to by the majority—it is an agreement as to what happens in the event of impossibility of performance. That's what this case is all about. The parties recognized that impossibility of performance would not excuse performance, so they took care of such contingency by agreement—Section 7. The problem is to determine the effect of such agreement on the term. Obviously, it does not extend the fifty year term; rather, it prevents such term from being shortened by impossibility of performance.

The majority notes that Section 7 contains some fourteen specifically enumerated matters which would excuse performance and to uphold the one before us as to orders of the Government would require that the others would also have to be upheld; this, they speculate could possibly cause this lease to run in perpetuity, a construction they term to be "most drastic and far-reaching." In the first place, the other matters are not before us for interpretation, and if we are to base our construction on speculation, we should speculate they are not likely to come before us in the few remaining years of the term. We should be sure that we are not running from one issue because it might lead to others. As to the possibility of war, riots, or the other matters, we will cross that bridge when we come to it. Secondly, the argument cuts both ways, for the other matters have been placed in the agreement by the parties, yet they are wiped out by this decision without ever being called into play. As to the suggestion of perpetuity, the lease can last only as much longer thereafter as there is production, which is the more common term of oil and gas leases and is neither

drastic nor far-reaching. That is also the term of this lease, except as modified by the fifty year term, which I find the parties intended to be in fact fifty years and not a lesser number due to impossibility of performance. Such a finding is necessary if we are to harmonize the provisions of the contract and say that fifty years is in fact fifty years of operations thereunder and this does not include such times as there are no operations due to impossibility. Had the parties not intended fifty years of operations, it would have been simple to say, Provided, that this lease shall expire on July 14, 1975 (50 years from date of making). Instead, even the habendum clause guards against forfeiture, the full provision following "as much longer thereafter" is:

> "Provided, that this lease shall not remain in force longer than fifty (50) years from this date, and provided further, that a temporary cessation of production due to cleaning out, working over or drilling deeper of any well, or similar causes occurring after production secured, shall not terminate this lease."

A matter which concerns the writer is the waste of natural resources which may occur if this lease is cut short. Under the terms of the lease, the Lessee has the right to remove all of its property at termination. It has the right to draw casing from the wells and plug them. Common sense and judicial knowledge (if the two can exist together) tell us that the equipment for operation of over 900 wells is valuable and will be removed at termination. What happens then to natural resources in place? Will some of them be lost? In the time that it takes to drill new wells of this number will the formations remain the same or will they have lost their drive and the fugacious products migrated? What will happen to the wells which produce small amounts that merit continued production as equipped, but will not support the cost of drilling and equipping a new well? Since the obligations of a Lessee to continue to produce are different from those to

drill and explore, will marginal production be lost? Will not cutting short this lease prevent or lessen the loss of oil and/or gas? If for no other reason, I think this case should be returned to the trial Court for development of the facts on the question of waste. This would seem to be a matter which should enter into this Court's consideration of the case, since the prevention of waste of natural resources is the policy of the State as set forth in the Constitution and Statutes and orders of the Railroad Commission. If the choice is otherwise equal, should not the Courts favor a construction which prevents waste? Also, the majority has found that the lease contract was entered into in contemplation of the regulatory authority vested in the Railroad Commission and has held that the rights of the contracting parties to an oil and gas lease will be subordinated to the regulatory authority of the State even though the contractual right or obligations may be affected in so doing.

I agree with the majority in their finding that "the lease contract was entered into in contemplation of the regulatory authority vested in the Railroad Commission." That answers any question as to the purpose of Section 7 with its provision as to time delays caused by orders of the Government. I strongly urge that we are not making a common sense construction of this contract when we find that the parties entered into it in contemplation of the regulatory authority of the Railroad Commission but did not intend that their agreement as to impossibility of performance included such orders. These are inconsistent findings. The only escape from them would be to adopt an argument of Appellees that if the parties intended their agreement to cover proration orders they could have said that. To so argue, is to admit that the agreement covers orders of the Government but is just not specific enough. Without attempting to look into the minds of the parties, suffice it to say they contracted as to "some order" of the Government. "Some order" includes these specific orders of the Railroad Commission. "Some" is defined in Funk & Wag-

nalls New Standard Dictionary as certain particular ones not definitely known or not specifically designated. "Any" may be used as a synonym for "some." Kayser v. Occidental Life Ins. Co. of California, 234 Iowa 310, 12 N.W.2d 582; "Some" is synonymous with "any." Holtz v. Plumer, 133 Neb. 878, 277 N.W. 589. In Brown, The Law of Oil & Gas Leases, Sec. 15.01, at page 254, it is said:

"The laws of a state regulating activities which become the subjects of contract between private individuals are just as much a part of the contract as if they were expressed or referred to therein, for, as said in 17 CJS [Contracts § 330] 783: ' . . . it is presumed that the parties had such law in contemplation when the contract was made.

"Accordingly, conservation laws, rules and regulations in force in a particular state become a part of an oil and gas lease covering lands in that state."

The conservation laws of the State of Texas, imposed by the Railroad Commission, have been a part of the lease before us since 1938. Neither party questions their validity and has never questioned them since their beginning, so far as the record shows. Is this "mute" evidence that they considered their effect to be governed by their agreement? Aside from such speculation, I would hold that such laws and regulations are included in the term "some order" of the Government, as used by the parties. The parties contracted as to delays caused by orders of the Government, and orders there were. As men bind themselves, so must they stand bound. Menard v. Sydnor, 29 Tex. 257; Southland Royalty Company et al. v. Pan American Petroleum Corporation et al., 354 S.W.2d 184 (Tex.Civ.App.1962) reversed on other grounds, Tex., 378 S.W.2d 50; Whitaker et al. v. Formby et al., 469 S.W.2d 241 (Tex.Civ.App.1971) n. r. e.

The time of delay which shall not be counted against Lessee is the time lost by each well which was denied its full producing time. Lessee's loss is not a delay in

producing the entire leased premises for a day for each well prorated. Quite simply, each well is entitled to produce the total number of days which it has been prohibited from producing by orders of the Railroad Commission. When then does this lease terminate? Will it be when the last well with the maximum number of days lost has made up those lost days? I think not, for this would allow the Lessee to continue to produce other wells above their delay losses. As a practical matter, I see no reason why the days lost cannot be converted to oil and gas which would have been produced, and when the total of such production has been made up the lease will terminate. This would appear to be permissible under contract law, and would certainly be permissible under the ownership of oil and gas in place theory. Certainty as to the date of termination is thus achieved. The total production to be made up can be known as of July 14, 1975. This is as certain, or more certain, than the termination dates of the "so long thereafter" leases. The amount of production lost due to the delays is a matter of proof as to which the Appellant-Lessee has the burden.

I would reverse and remand this case to the trial Court.