**STAHL PETROLEUM COMPANY,**
Appellant,

v.

**PHILLIPS PETROLEUM COMPANY,**
Appellee.

No. 8762.

Court of Civil Appeals of Texas, Amarillo.

April 6, 1977.

Rehearing Denied May 2, 1977.

Stone, Stone & Chambers, John C. Chambers, Amarillo, for appellant.

Phillips Petroleum Co., Jack Ritchie, T. L. Cubbage, II, David B. McCall, T. L. Cubbage, Amarillo, Lloyd G. Minter, C. J. Roberts, Bartlesville, Okl., for appellee.

REYNOLDS, Justice.

The question presented by this appeal is whether Phillips Petroleum Company is liable to Stahl Petroleum Company for interest on the additional amounts Phillips computed and paid Stahl under their gas purchase contract after federal approval of a portion of the interstate commerce gas prices Phillips had been receiving for its sales, a weighted average of which was the basis of the payments to Stahl. In the declaratory judgment action, the trial court held that Phillips was contractually obligated for the payment made, but was not liable for any interest thereon. For the reasons hereinafter stated, we conclude that Phillips was liable for interest. Affirmed in part; reversed and rendered in part.

By a contract dated 5 December 1957, Phillips Petroleum Company agreed to buy,

and Panhandle Gas Compression Company agreed to sell, casinghead gas owned or purchased by Panhandle which is produced from wells located on the

SE/4 of Section 1, Block 26, and S/2 of Section 12, Block A–9, and Section 61 and E/2 of Section 62, Block 25, H&GN RR. Co. Survey, Gray County, Texas.

Stahl Petroleum Company is the successor in interest to Panhandle, which is now defunct.

Contractually, upon delivery of the gas, title vests in Phillips without regard to the disposition made of the gas by Phillips. Payment for the gas delivered each month is to be made not later than the last day of the succeeding month. As to price, the contract states:

7. PRICE—As full consideration for the gas and all components thereof purchased by Buyer [Phillips] hereunder, Buyer shall pay Seller [Stahl] a price which shall be the sum of the computations prescribed in A and B below:

A. Multiply the volume of gas delivered by the applicable "Rate in Cents Per Thousand Cubic Feet" shown in Table II.[1]

B. Multiply the difference between the volume of gas Seller was entitled to have delivered for lease operation and the volume (determined by estimate or measurement) that was delivered for such purpose, by one-half of the first 2.6798¢ or less of the weighted average price per thousand cubic feet during the month preceding that for which settlement is made, and by two-thirds of the amount by which said weighted average price exceeded 2.6798¢.

8. DEFINITIONS—* * *

The phrase "weighted average price per thousand cubic feet" shall mean the weighted average price received by Buyer and its subsidiaries from the sale to others than Buyer and its subsidiaries of gas (whether sweet, sour or casinghead), and any components thereof, delivered by Buyer in the form of gas within the Pan-

handle Field of Texas, adjusted as hereinafter provided.

The price adjustments provided are for the inclusion of amounts received for, or deductions to be made under certain circumstances because of, transportation, purification, dehydration or compression of the gas Phillips delivers to its purchasers.

The contract is subject to all valid statutes and rules and regulations of any federal or state regulatory body having jurisdiction. Prior to the execution of the contract, it was determined in *Phillips Petroleum Company v. State of Wisconsin*, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954), that Phillips, as an independent natural gas producer selling gas to interstate pipeline companies for interstate transportation and resale, was a "natural gas company" within the meaning of the Natural Gas Act, 15 U.S.C. § 717 *et seq.,* and that its gas sales in interstate commerce are subject to the jurisdiction of and regulation by the Federal Power Commission.

The Panhandle Field of Texas is a part of the Hugoton-Anadarko Area, a rate making area within the jurisdiction of the Federal Power Commission. Gas sales made by Phillips within the Panhandle Field are for both intrastate and interstate commerce; thus, the sales made for interstate commerce are subject to the jurisdiction of and the rate approved by the Federal Power Commission.

Beginning 7 June 1954 and continuing past the execution date of the Phillips-Stahl contract, Phillips had numerous gas price rate increase applications, some of which related to sales in the Panhandle Field, pending with the Federal Power Commission. Increases in gas prices subject to the jurisdiction of the Commission operate prospectively only. 15 U.S.C. §.717c(d); *Atlantic Refining Co. v. Public Service Commission of the State of New York*, 360 U.S. 378, 389, 79 S.Ct. 1246, 1253, 3 L.Ed.2d 1312, 1319–20 (1959). Generally, a proposed increase in rates will take effect after thirty days' notice, 15 U.S.C. § 717c(d), unless the

---

1. The attached Table II shows the rate in cents per thousand cubic feet is determined by the

test gasoline content and the price of gasoline in cents per gallon.

Commission, pending a hearing and decision, suspends the operation of the proposed rate schedule for not longer than five months beyond the time the change would go into effect. 15 U.S.C. § 717c(e). If an order has not been made at the expiration of the suspension period, the proposed change shall go into effect upon the motion of the natural gas company making the proposal. In that event, the Commission may require the natural gas company to furnish a bond to refund the portion of such increased rates, with interest, the Commission finds is not justified. 15 U.S.C. § 717c(e).

With respect to Phillips' proposed rate increases, the Commission suspended the effectiveness of the increases, some thirty-one of which related to Phillips' gas sales in the Panhandle Field. Thereafter, upon the posting of a corporate obligation, Phillips was permitted by the Commission to sell gas in the Panhandle Field for interstate commerce at its proposed rate increases, subject to refund with interest of all monies collected from its purchasers in excess of the just and reasonable rates to be determined by the Commission. It would not be known until the Commission entered its final order what portion, if any, of the amounts Phillips received in excess of the then established interstate commerce rates would be refunded with interest to Phillips' purchasers, or what portion, if any, would constitute interstate commerce sales at approved just and reasonable rates. All proceeds Phillips received from its sales, including the monies subject to refund, were deposited in Phillips' general fund.

Meanwhile, for the gas purchased under the contract, Phillips paid Stahl the prescribed percentage of the weighted average price received by Phillips from Panhandle Field intrastate gas sales at prices not subject to the Commission's jurisdiction and from interstate sales at rates theretofore established by the Commission for sales within its jurisdiction. Consequently, none of the then unapproved increased prices received by Phillips from, and subject to refund to, its purchasers were included in the calculations of the payments due and made to Stahl.

Eventually, on 18 September 1970, the Federal Power Commission issued Opinion 586 and accompanying order, establishing the sales prices pursuant to Phillips' and other consolidated applications and requiring refunds of amounts collected, except for certain excused amounts, in excess of the established rates. 44 F.P.C. 761 (1970). Court review ensued in *In re Hugoton-Anadarko Area Rate Case [The People of the State of California v. Federal Power Commission]*, 466 F.2d 974 (9th Cir. 1972). There, the Commission's order was affirmed, and no petition for writ of certiorari was filed on or before 29 October 1972, the last day permitted by law.

When the rate order became final on 30 October 1972, Phillips recalculated the amounts payable under the contract on the basis of the collected interstate commerce sales amounts Phillips was entitled to retain. The computed amount was an additional $24,258.81, which Phillips paid to Stahl on 7 December 1972. So far as this record reveals there was neither an agreement that the payment was in full settlement nor a contemporaneous claim by Stahl for interest or a specific reservation of right to later sue for interest.

Almost three years later, Phillips filed this declaratory judgment action. It sought a declaration that under the contract, it was not liable to Stahl for any sums in excess of payments made based on prices approved by the Federal Power Commission at the time the payments were made. Alternatively, Phillips asked that if it was accountable to Stahl on the basis of prices finally approved by the Commission, then it be declared that it is not liable for interest thereon, and, in no event, for interest prior to 30 October 1972, the date the rates became final.

Stahl counterclaimed. It sought judgment decreeing that it was entitled to receive payment based on the rate ultimately approved by the Federal Power Commission with interest thereon from the respective dates on which Phillips received the funds.

Among the matters Stahl established by admissions were that the interest calculated to date of payment of the $24,258.81 would be $14,094.12, and that interest on that interest would accrue at the rate of $2.3168 per day, which the trial court calculated to be $3,011.84.

During the pendency of this action, Stahl declared, in response to an interrogatory, that the date a cause of action ripened in Stahl whereby Stahl could sue Phillips to force payment of the additional proceeds was 30 October 1972. Phillips requested that, among other matters, Stahl admit as matters of fact, and Stahl admitted, that: (1) the paragraphs of the contract relating to the purchase price and payment are not ambiguous; (2) until 30 October 1972, the amounts of additional money, if any, that might be payable was uncertain and unliquidated and the amount ultimately calculated to be due was unknown; (3) prior to 30 October 1972, Stahl had no legal right to force Phillips to pay, on a month-by-month basis, a sum in excess of the one computed in relation to a weighted average price calculated on interstate gas sales at the approved Federal Power Commission rates and on intrastate gas sales in the Panhandle Field; (4) on 30 October 1972, the additional purchase price of $24,258.81 recalculated on the sales prices approved by FPC Opinion 586 accrued, was on that day ascertainable, liquidated and became due and payable to Stahl; and (5) the payment due 30 October 1972 was subject to Phillips' right to a reasonable time, not to exceed three months, to complete administrative action to cause the payment to be made.

The trial court heard and on 28 June 1976 determined the matters without the aid of a jury. The court's judgment declared that under the unambiguous payment provisions of the contract, Phillips was not expressly, but was impliedly, obligated to pay Stahl, upon the finality of the Federal Power Commission action, the $24,258.81 difference between the price previously paid and the price that would have been paid had the higher approved price been in effect, but that Phillips was not liable for interest.

Stahl's claims for interest were denied. The judgment is buttressed by fifty-one denominated findings of fact and eleven main conclusions of law, some of which are the same as Stahl's admissions.

Stahl has appealed. Accepting the adjudication that $24,258.81 was due under the contract for its gas, Stahl contends, first, that it is entitled to judgment for $14,094.12 interest accruing thereon to date of payment and, second, that it is entitled to $3,011.84 interest on the $14,094.12 to date of judgment, together with interest on the judgment. In resisting Stahl's claims, Phillips does not challenge the trial court's determination that it was contractually obligated to pay the additional $24,258.81 it paid.

Admittedly in this cause, the paramount question is whether the contractual payment bears interest under Texas law. In citing Texas law, as well as law from other jurisdictions, in support of their respective positions, both parties converge on and differ as to the efficacy of *Phillips Petroleum Company v. Adams,* 513 F.2d 355 (5th Cir. 1975), *cert. denied* 423 U.S. 930, 96 S.Ct. 281, 46 L.Ed.2d 259 (1975). In *Adams,* a claim for interest arose out of the identical factual situation presented in the case at bar. The United States District Court for the Northern District of Texas at Amarillo determined, in an unpublished opinion, that neither equity nor Texas law supported an award of interest. The Fifth Circuit, recognizing that the factual situation had no close parallel in Texas case law, concluded that Texas law does not preclude and, therefore, permits, and that equity requires, the award of interest because Phillips had the unrestricted use of the Adams' money from the dates of its receipt. 513 F.2d at 364, *et seq.*

Stahl contends that *Adams* correctly applies Texas law, answers the arguments now advanced by Phillips, and obligates Phillips to pay the interest claimed. *Amici curiae* briefs filed here are to the same effect and in some instances advance additional rationale why Phillips is liable for interest. Phillips responds that *Adams* is

erroneous in not stating the correct Texas law and that some of the arguments it makes here were not made in *Adams.* Be that as it may, our determination of the question is founded on principles of statutory and decisional law of this state applied in a manner different from the application of principles stated in *Adams.*

Ninety years ago, Texas jurisprudence embraced the common law principle that interest cannot be allowed *eo nomine*—i. e., under that name—unless especially provided for by statute, except where interest is assessed, sans statutory sanction, as damages to indemnify a party for a wrong done to him. *Heidenheimer v. Ellis,* 67 Tex. 426, 3 S.W. 666, 667 (1887). *Accord, Watkins v. Junker,* 90 Tex. 584, 40 S.W. 11 (1897). *Heidenheimer,* without sanction of statute, allowed "interest" on a stated account from the time the principal ought to have been paid, not as an incident to the debt, but by way of punishment for the wrong inflicted by the wrongdoer. In *Watkins,* prejudgment interest was allowed on breach of contract damages unliquidated but fixed by conditions existing at the breach. The court said, "It is true that interest, strictly speaking, exists only by statutory law, but it is likewise true that courts have recognized the fact that compensation for detention of that which is due on account of injury inflicted is an element of damages necessary to the complete indemnity of the injured party;  .   .  ." The court immediately noted that while it may not be technically correct to designate as "interest" the compensation allowed as damages on account of the injury inflicted, the term is so familiar that it is perhaps the most expressive and intelligible term that could be used.

Here, we are not concerned with the situation of the infliction of a tortious injury where "interest" may or may not be an element of damages; rather, because the interest claims arise *ex contractu,* any interest payable under the contract is interest eo nomine authorized by statute. At the time the Phillips-Stahl contract was executed, the legislature had defined "interest"

as "the compensation allowed by law or fixed by the parties to a contract for the use or forbearance or detention of money." Vernon's Ann.Civ.St. art. 5069. That statutory definition was replaced on 1 October 1967 by the enactment of V.A.C.S. art. 5069–1.01 reading, in part: "(a) 'Interest' is the compensation allowed by law for the use or forbearance or detention of money."

■ In contractual undertakings, the transactors may, of course, provide for interest; but, absent contractual provisions, the question of whether interest is allowable under an existing state of facts is a question of law. Here, the written Phillips-Stahl contract has no provision for the payment of interest; therefore, if any interest is payable by virtue of the contractual undertaking, it is by authority of some enabling Texas statute.

■ The statute having application to written contracts when the contract before us was executed was V.A.C.S. art. 5070, and the applicable statute when this litigation arose is V.A.C.S. art. 5069–1.03, in both of which identical language was used to state:

When no specified rate of interest is agreed upon by the parties, interest at the rate of six percent per annum shall be allowed on all written contracts ascertaining the sum payable, from and after the time when the sum is due and payable;  .   .   .

When the statutory prerequisites are present, the statute creates a legal liability for interest. Thus, the subsidiary questions arising are: (1) Is this a written contract ascertaining the sum payable as meant by the statute? (2) When is the sum, as ascertained, due and payable?

Without in any way referring to the statute, Stahl claims interest because Phillips used Stahl's money which Phillips was contractually obligated to pay throughout although the exact amount was not known until the Federal Power Commission's order became final. Phillips contends that the statute does not impose interest because, and points to Stahl's admissions that, under the contract the sum payable was neither

ascertainable nor due and payable until the finality of the Commission's order.

■ The statutory phrase "ascertaining the sum payable" was first interpreted in *Federal Life Ins. Co. of Chicago v. Kriton,* 112 Tex. 532, 249 S.W. 193 (1923). The court said at 195:

> . . . (T)he words "ascertaining the sum payable" have reference to the sum or amount the party executing the obligation may be reasonably expected or required to pay, in view of all the circumstances incident to the matter or business he is contracting about, if by reason of the provision of the contract he becomes at any time liable to pay thereunder; and it is not necessary in a case like the present one that the contract shall itself establish a fixed liability in a definite amount as of a date certain. It is sufficient to come within the meaning of the statute if the contract provides the conditions upon which liability depends and fixes a measure by which the sum payable can be ascertained with reasonable certainty, in the light of the attending circumstances.

■ Given these principles, we turn to the contract in which the rights of the parties rest. There never was any contention that the contract or any of its terms are ambiguous; indeed, the parties are committed to the proposition that the contract is unambiguous. As a consequence, and because we find the contract to be without ambiguity necessitating an inquiry beyond the contract's language, the meaning of the contract becomes a question of law for the court. *Myers v. Gulf Coast Minerals Management Corporation,* 361 S.W.2d 193, 196 (Tex.1962). As a matter of law, the meaning of the contract is determined by the language used therein, *Tower Contracting Company v. Flores,* 157 Tex. 297, 302 S.W.2d 396, 399 (1957), which is to be construed by the court. *Republic National Life Insurance Company v. Spillars,* 368 S.W.2d 92, 94 (Tex.1963). The terms the parties used are to be given their plain, ordinary and generally accepted meaning unless the instrument itself shows the terms are used in a different sense. *Western Reserve Life Ins. Co. v. Meadows,* 152 Tex. 559, 261 S.W.2d 554, 557 (1953).

■ As is evident from the contract, a part of the price Phillips contracted to pay, and Stahl contracted to take, is a percentage of the "weighted average price received" by Phillips from the sale of all gas within the Panhandle Field. Except for the specified adjustments to the price received by Phillips from its sales, the phrase "price received" is not otherwise defined in the contract. The phrase consists of two words of ordinary meaning. In the more common sense, according to Webster's New International Dictionary (2nd Ed.), the noun "price" means the amount of money received in exchange for anything, and the transitive verb "received" means to take as something paid or to accept payment. This ordinary meaning is the one we should attribute to the phrase.

At the time the contract was executed, Phillips, as permitted during the pendency of its applications for increases in the interstate commerce rates for its gas sales, was receiving from its purchasers and accepting as payment for its gas an amount of money in excess of the then established rates. Albeit the excess was subject to possible refund, none of the excess was contractually excluded from the "price received" by Phillips and on which payment to Stahl was contractually based. Phillips candidly concedes that neither statutory or decisional law nor the rules and regulations of the Federal Power Commission prohibit Phillips from including the excess in the amount on which calculation of payment to Stahl was made.[2] It naturally follows that the portion of the prices exceeding the then approved interstate commerce rate received by Phillips from its gas sales in the Panhandle Field was, under the plain meaning of the language of the contract, a part of the

---

2. It is recorded in fn. 10 at p. 362 of *Phillips Petroleum Company v. Adams,* 513 F.2d 355 (5th Cir. 1975), that Phillips has included the excess in calculating payments under similar contracts pursuant to agreements that any overpayment would be returned with interest.

"price received" on which the month-by-month payments to Stahl were to be based. Hence, within the meaning of the statute, the written contract is one ascertaining the sum payable, and interest is allowable on each unpaid sum which was due and payable monthly under the contract. And there is nothing in the contract to alter this legal consequence even though it later developed that Phillips was required to refund to its purchasers a portion of the purchase prices it had received.

The trial court decreed, and Stahl does not dispute, that the $24,258.81 which Phillips paid Stahl on 7 December 1972 was the difference between what Phillips previously paid Stahl each month and what would have been paid under the contract had the higher rates been in effect when Stahl's gas was sold to Phillips. The interest on that amount, which is statutorily imposed, is fixed at $14,094.12. Consequently, when Phillips made the $24,258.81 payment, Phillips owed Stahl a total of $38,352.93 for the sums ascertainable to be payable month-by-month under the contract with accrued interest thereon from the time the monthly payments were due and payable.

With respect to the $24,258.81 additional payment, all this record shows is that the payment is the recomputed amount Phillips would have paid in monthly increments at the later established rate, and the amount Stahl admitted and the trial court found was due at that rate, for the casinghead gas Phillips had purchased from Stahl under their contract. This record does not disclose any agreement concerning the payment, but it does affirmatively reflect that at the time this suit was filed, a genuine controversy existed between Phillips and Stahl as to whether Phillips was obligated under the contract to account to Stahl for any sum over the payments already made based on the Federal Power Commission's rates in effect when the payments were made, and if so, whether Phillips was liable for interest on the additional sum.

■ It is the universal rule, and the rule followed in Texas, that where the parties have not otherwise agreed, a partial payment on a single obligation consisting of principal and interest is first applied to extinguish the accrued interest and the balance is then applied toward discharging the principal. *Community Savings and Loan Association v. Fisher,* 409 S.W.2d 546, 550 (Tex.1966); *Tooke v. Bonds,* 29 Tex. 419, 427 (1867); *J. I. Case Co. v. Laubhan,* 64 S.W.2d 1079, 1080 (Tex.Civ.App., Amarillo 1933, no writ), and authorities there cited. Under the circumstances present in the record we review, this rule applies.

■ Computably, then, $14,094.12 of the $24,258.81 payment is applied to extinguish the interest which had accrued to the date of payment. The $10,164.69 balance of the payment reduces the principal owed at that time to $14,094.12. Interest on that sum, as unpaid principal, at the statutory rate of six per cent per annum to the date of judgment is not challenged to be $3,011.84. Therefore, Stahl was, and is, entitled to judgment for $17,105.96, consisting of $14,094.12 unpaid principal and $3,011.84 prejudgment interest. To this extent, Stahl's two points of error are sustained.

Some further observations concerning consideration given matters injected in this appeal but not heretofore mentioned are appropriate. Because the interest allowed is interest eo nomine imposed by statute absent any finding, or any evidence to support one, that the principal payment was in full settlement, the recovery of interest is not barred under Phillips' cited authorities denying interest *as damages* where the principal sum due is paid and accepted.

■ Arguably from the parties' performance under the contract, the term "price received" was understood and intended by them to mean the price Phillips was lawfully entitled to retain, and that such construction should be given controlling weight. The immediate answer is that the lack of ambiguity in the term forecloses the application of the principle. In the usual case, the contract alone will be deemed to express the intention of the parties, for it is objective and not subjective intent that controls. *Spillars, supra,* 368 S.W.2d at 94. If

the contract is so worded that it can be given, as we have given the contract here, a certain or definite legal meaning or interpretation by applying the pertinent rules of interpretation, the contract is not ambiguous, and parol evidence will not be received to create an ambiguity or to give the contract a meaning different from that which its language imparts. *Universal C. I. T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 157 (1951). This rule obtains even to the extent of prohibiting proof of circumstances surrounding the transaction when the instrument involved, by its terms, plainly and clearly discloses the intention of the parties, or is so worded that it is not fairly susceptible of more than one legal meaning or ·construction, *Lewis v. East Texas Finance Co.,* 136 Tex. 149, 146 S.W.2d 977, 980 (1941), for no intention, however discovered, can contradict or destroy the legal effect of the terms used. *Reynolds v. McMan Oil & Gas Co.,* 11 S.W.2d 778, 781 (Tex.Com.App.1928, holding approved).

Our interpretation of the written contract is, of course, at variance with both the recited interrogatory declaration and "admissions" made by Stahl and the legal conclusions drawn by the trial court to determine that Phillips is not liable for interest. Stahl's declaration and admissions amount to no more than expressions of opinions on matters of law which have no legal effect. *Reynolds, supra,* 11 S.W.2d at 786. As previously stated, the meaning of this unambiguous contract is a matter of law for the court. In interpreting it, we have reached conclusions of law as the necessary legal consequence of the same factual situation before the trial court and, insofar as the trial court's legal conclusions drawn from those facts conflict with ours, we deem them erroneous.

That part of the trial court's judgment denying Stahl any recovery and imposing costs is reversed, and judgment is here rendered that Stahl Petroleum Company recover from Phillips Petroleum Company the sum of $17,105.96, together with interest thereon at the rate of nine percent per annum from 28 June 1976, the date of the trial court's judgment, until paid, V.A.C.S. art. 5069–1.05 (Supp.1976), and all costs. In all other respects, the judgment is affirmed.

## ON MOTION FOR REHEARING

By its motion for rehearing, Phillips Petroleum Company submits that we gave undue emphasis to the meaning of the word "received" and failed to give adequate attention to the meaning which the word "price" must have in the context of the contract. The ultimate contention is that, when the contract is viewed in its entirety in relation to the federal statutes and rules and regulations to which it is subject, "price" means the actual proceeds Phillips received and had a lawful right to retain after refunding the amounts received in excess of the "just and reasonable" rate or charge finally determined by the Federal Power Commission. Therefore, Phillips says, it is not reasonable to reach a conclusion that the parties contracted on the basis of prices other than those which Phillips would be lawfully entitled to retain.

The reasons for denying the contention, which was considered on original submission and reconsidered on rehearing, are two-fold. First, the contract was drafted when Phillips was receiving a price in excess of the established "just and reasonable" rate, although subject to refund, but the ordinary meaning of "price received," to which Phillips' obligation to pay was related, was not qualified to express the intention to exclude any refundable price received. Second, the contention can be justified only by invoking arbitrary rules of construction which, under the rationale stated in our original opinion, may not be resorted to where the contractual expressions are, as the parties have agreed and as we found them to be, unambiguous.

The Supreme Court, whose pronouncements on the law bind us, has declared that where the contractual language is plain, clear and unambiguous, we are not at liberty to revise a contract under the guise of professing to construe it or to make for the parties a contract different from the one they entered into. See, e. g.,

*General American Indemnity Company v. Pepper,* 161 Tex. 263, 339 S.W.2d 660, 661 (1960). Thus, rather than ascribing to the language a meaning different from that which it clearly imports, all we may do is state and enforce the contract the parties have written.

The motion for rehearing is overruled.